UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SOSS2, INC.,

                              Plaintiff,

        v.

UNITED STATES ARMY CORPS OF
ENGINEERS,

                              Defendant

Case No. 8:19-cv-00462-SDM-JSS

**UNITED STATES ARMY CORPS
OF ENGINEERS' OPPOSITION TO
PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT AND
CROSS-MOTION FOR SUMMARY
JUDGMENT**

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................ 1

II.    STATUTORY AND REGULATORY BACKGROUND ........................................... 2

    A.    The National Environmental Policy Act ......................................... 2

    B.    The Clean Water Act ..................................................................... 3

    C.    The Endangered Species Act ......................................................... 4

    D.    The Marine Mammal Protection Act .............................................. 7

    E.    The Administrative Procedure Act ................................................. 7

III.    FACTUAL BACKGROUND ............................................................................. 9

    A.    Project Details ............................................................................... 9

    B.    State Requirements and Administrative Process ........................... 11

    C.    2018 EA/FONSI ........................................................................... 12

    D.    Current Litigation ....................................................................... 14

    E.    Project Status ............................................................................... 14

IV.    ARGUMENT .................................................................................................. 15

    A.    The Corps has Satisfied Requirements of NEPA. ........................... 15

        1.    The Corps Took A Hard Look at Potential Effects of the Project. ......... 15

            a.    The Corps examined potential environmental effects. ............... 16

            b.    The Corps examined potential economic effects of the Project .................................................................................... 17

            c.    The Corps examined potential navigation effects. ..................... 18

        2.    The 2018 EA Properly Addresses All Cumulative Impacts. ................. 19

        3.    The Corps Analyzed Baseline Conditions. ............................................ 19

        4.    The Corps Reasonably Relied on Recent Data and Analyses. .............. 20

5.      The Corps Considered a Reasonable Range of Alternatives. ................. 20

6.      The Corps Examined Mitigation Related to the Project. ........................ 22

7.      The Corps' Decision Was Reasonable and Supported by the
        Record. .......................................................................................... 22

B.    The Project Is Consistent With The Clean Water Act. .................................... 23

C.    The Corps Complied With the ESA ................................................................. 26

1.      Plaintiff Failed To Provide the Requisite Notice. ............................... 27

2.      The Corps Completed ESA Consultations With FWS and NMFS
        To Determine Project Effects In the Project Effects Both On
        Lido Key and in the Marine Environment In the Vicinity of the
        Sand Sources ....................................................................................... 28

3.      The Corps Adequately Considered Potential Project Effects On
        Seagrasses. .......................................................................................... 29

4.      The Corps Considered Potential Project Effects On Designated
        Critical Habitat Through Consultations With FWS and NMFS. ........ 30

5.      The Corps Addressed Potential Cumulative Effects On Listed
        Species. ............................................................................................... 31

6.      FWS Reasonably Concurred With the Corps' Determination
        That the Project Is Not Likely To Adversely Affect the West
        Indian Manatee. .................................................................................. 32

D.    Plaintiff Has Not and Cannot Plead A Marine Mammal Protection Act
        Claim, and In Any Case, the Corps Is Not Violating the Act. ........................ 35

V.    CONCLUSION ........................................................................................................... 35

# TABLE OF AUTHORITIES

**Cases**

*Am. Canoe Ass'n v. City of Attalla*,
363 F.3d 1085 (11th Cir. 2007) .................................................... 27, 28

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*,
462 U.S. 87 (1983) .......................................................................... 8

*Bar MK Ranches v. Yuetter*,
994 F.2d 735 (10th Cir. 1993) ........................................................ 8

*Bennett v. Spear*,
520 U.S. 154 (1997)........................................................................ 27

*Black Warrior Riverkeeper, Inc. v. United States Army Corps of Eng'rs*,
354 F. Supp. 3d 1253 (N.D. Ala. 2018)......................................... 2

*Buckhead Civic Ass'n v. Skinner*,
903 F.2d 1533 (11th Cir. 1990) ................................................. 8, 31

*Building Indus. Ass'n v. Lujan*,
785 F. Supp. 1020 (D.D.C. 1992)................................................. 28

*Citizens for Smart Growth v. Sec'y of Dep't of Transp.*,
669 F.3d 1203 (11th Cir. 2012) ..................................................... 8

*City of Oxford, Ga. v. FAA*,
428 F.3d 1346 (11th Cir. 2005) ..................................................... 2

*Coastal Conservation Ass'n v. Gutierrez*,
2005 WL 2850325 (M.D. Fla. 2005) ............................................. 3

*Druid Hills Civic Ass'n, Inc. v. Fed. Highway Admin.*,
772 F.2d 700 (11th Cir. 1985) ................................................. 20, 23

*Fair v. Kohler Die & Specialty Co.*,
228 U.S. 22 (1913)......................................................................... 35

*Fla. Key Deer v. Paulison*,
522 F.3d 1133 (11th Cir. 2008) ................................................... 33

*Fla. Power & Light Co. v. Lorion*,
470 U.S. 729 (1985)........................................................................ 8

*Forest Guardians v. U. S. Bureau of Reclamation*,
462 F. Supp. 2d 1177 (D.N.M. 2006) ........................................... 28

*Fund for Animals, Inc. v. Rice*,
85 F.3d 535 (11th Cir. 1996) ............................................. 2, 3, 8, 33

*Ga. River Network v. U.S. Army Corps of Eng'rs,*
   No. 10-cv-267, 2012 WL 930325 (S.D. Ga., Mar. 19, 2012)............................................ 15

*Hallstrom v. Tillamook Cty.,*
   493 U.S. 20 (1989)................................................................................................... 27, 28

*Haw. Cty. Green Party v. Clinton,*
   124 F.Supp.2d 1173 (D. Haw. 2000) ............................................................................ 7

*Hawksbill Sea Turtle v. FEMA,*
   126 F.3d 461 (3d Cir. 1997) ....................................................................................... 27

*Healy v. Sea Gull Specialty Co.,*
   237 U.S. 479 (1915)................................................................................................... 35

*Kleppe v. Sierra Club,*
   427 U.S. 390 (1976)..................................................................................................... 8

*Loggerhead Turtle v. Cty. Council of Volusia Cty., Fla.,*
   120 F. Supp. 2d 1005 (M.D. Fla. 2000) ...................................................................... 35

*Marsh v. Or. Nat. Res. Council,*
   490 U.S. 360 (1989)................................................................................................ 3, 32

*Merrell Dow Pharms. v. Thompson,*
   478 U.S. 804 (1986)................................................................................................... 35

*Miccosukee Tribe of Indians of Fla. v. United States,*
   566 F.3d 1257 (11th Cir. 2009) ............................................................................ 31, 32

*Miccosukee Tribe of Indians v. United States,*
   420 F. Supp. 2d 1324 (S.D. Fla. 2006) ......................................................................... 8

*Mo. Mining, Inc. v. Interstate Commerce Comm'n,*
   33 F.3d 980 (8th Cir. 1994) ....................................................................................... 21

*Moden v. U.S. Fish & Wildlife Serv.,*
   281 F.Supp.2d 1193 (D. Or. 2003) ............................................................................. 28

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983)....................................................................................................... 8

*Nat. Res. Def. Council v. Nat'l Park Serv.,*
   250 F. Supp. 3d 1260 (M.D. Fla. 2017)...................................................................... 31

*Nat. Res. Def. Council, Inc. v. Van Antwerp,*
   No. 07-80444-CIV, 2008 WL 11333805 (S.D. Fla. Jan. 18, 2008)................................. 9

*Nat'l Envtl. Found. v. ABC Rail Corp,*
   926 F.2d 1096 (11th Cir. 1991) ................................................................................. 27

iv

*Nat'l Parks & Conservation Ass'n, Inc. v. Tenn. Valley Auth.,*
  502 F.3d 1316 (11th Cir. 2007) ...................................................................... 27

*Native Ecosystems Council v. U.S. Forest Serv.,*
  428 F.3d 1233 (9th Cir. 2005) ........................................................................ 21

*Nw. Res. Info. Ctr. v. NMFS,*
  56 F.3d 1060 (9th Cir. 1995) .......................................................................... 5

*Pres. Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs,*
  87 F.3d 1242 (11th Cir. 1996) ........................................................................ 2

*Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of the Navy,*
  898 F.2d 1410 (9th Cir. 1990) ........................................................................ 33

*Save Our Cumberland Mountains v. Kempthorne,*
  453 F.3d 334 (6th Cir. 2006) .......................................................................... 21

*Sierra Club v. Marsh,*
  816 F.2d 1376 (9th Cir. 1987) ........................................................................ 35

*Sierra Club v. U.S. Army Corps of Eng'rs,*
  295 F.3d 1209 (11th Cir. 2002) ........................................................ 31, 32, 35

*Sierra Club v. U.S. Army Corps of Eng'rs,*
  464 F. Supp. 2d 1171 (M.D. Fla. 2006) .......................................................... 21

*Sierra Club v. Van Antwerp,*
  526 F.3d 1353 (11th Cir. 2008) ...................................................................... 8

*Sw. Ctr. for Biological Diversity v. United States Bureau of Reclamation,*
  143 F.3d 515 (9th Cir. 1998) .......................................................................... 27

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,*
  435 U.S. 519 (1978) .................................................................................. 20, 21

**Statutes**

5 U.S.C. § 702 ...................................................................................................... 2

5 U.S.C. § 706 ................................................................................................. 7, 14

5 U.S.C. § 706(2)(A) ........................................................................................... 7

5 U.S.C. § 706(2)(A) ........................................................................................... 2

5 U.S.C. § 706(2)(E) ........................................................................................... 2

16 U.S.C. § 1532(15) ........................................................................................... 5

16 U.S.C. § 1532(20) ........................................................................................... 5

16 U.S.C. § 1532(6) ........................................................................................................... 5

16 U.S.C. § 1533(a) ........................................................................................................... 5

16 U.S.C. § 1536(a) ......................................................................................................... 34

16 U.S.C. § 1536(a)(2) ...................................................................................................... 5

16 U.S.C. § 1536(b) ........................................................................................................... 5

16 U.S.C. § 1540(a) ........................................................................................................... 6

16 U.S.C. § 1540(b) ........................................................................................................... 6

16 U.S.C. § 1540(e)(6) ....................................................................................................... 6

16 U.S.C. § 1540(g)(1)(A) ......................................................................................... 2, 7, 27

16 U.S.C. § 1540(g)(2)(A)(i) ..................................................................................... 7, 27, 28

16 U.S.C. §§ 1361-1423h .................................................................................................. 1

16 U.S.C. §§ 1531-1544 .................................................................................................... 1

16 U.S.C. §1361(1) ........................................................................................................... 7

16 U.S.C. §1371(a)(5)(A)(i) ............................................................................................... 7

16 U.S.C. §1372(a)(2)(A) .................................................................................................. 7

16 U.S.C. §1456 .............................................................................................................. 11

16 U.S.C. §1855 .............................................................................................................. 30

33 U.S.C. § 1251(a)(1)-(2) ................................................................................................. 3

33 U.S.C. § 1341 ............................................................................................................. 11

33 U.S.C. § 1344 ........................................................................................................... 3, 4

33 U.S.C. § 1344(a) ........................................................................................................... 4

33 U.S.C. § 1344(a) ......................................................................................................... 24

33 U.S.C. § 1344(b) ........................................................................................................... 4

33 U.S.C. § 1344(r) ....................................................................................................... 4, 24

33 U.S.C. § 2211 ............................................................................................................. 14

33 U.S.C. §§ 1251-1388 .................................................................................................... 1

42 U.S.C. § 1962d-5b(a)(1) .............................................................................................. 14

42 U.S.C. § 4332(2)(C) ...................................................................................................... 3

42 U.S.C. § 4332(2)(E) ................................................................................ 20

42 U.S.C. §§ 4321-4370h ............................................................................. 1

Pub. L. 110-114, 121 Stat. 1117-18 (2007) ................................................ 10

Pub. L. No. 106-53, 113 Stat 269 (1999) .................................................... 10

Pub. L. No. 99-662, 100 Stat 4082 (1986) .................................................. 10

Fl. Admin. Code Ann. 62-4.242(2)(b)2 (2016) ........................................... 26

**Regulations**

33 C.F.R. § 230.10(a) ................................................................................... 15

33 C.F.R. Part 323 ........................................................................................ 4

33 C.F.R. § 328.3(a) ..................................................................................... 4

33 C.F.R. § 335.2 .................................................................................... 4, 24

33 C.F.R. § 336.1(a) ............................................................................... 4, 24

40 C.F.R. § 1502.14(f) ................................................................................. 22

40 C.F.R. § 1502.14(h) ................................................................................ 22

40 C.F.R. § 1508.13 ...................................................................................... 3

40 C.F.R. § 1508.20(e) ................................................................................ 22

40 C.F.R. § 1508.25(c)(3) ............................................................................ 19

40 C.F.R. § 1508.7 ....................................................................................... 19

40 C.F.R. § 1508.8 ....................................................................................... 16

40 C.F.R. § 1508.9 ......................................................................................... 3

40 C.F.R. § 1508.9(b) .................................................................................. 20

40 C.F.R. Part 230 ......................................................................................... 4

40 C.F.R. § 230.10(a) ............................................................................... 4, 24

40 C.F.R. § 230.10(a)(2) ............................................................................... 4

40 C.F.R. § 230.11 ....................................................................................... 24

40 C.F.R. § 230.11(a) ................................................................................... 25

40 C.F.R. § 230.11(c) ................................................................................... 25

40 C.F.R. § 230.2(a)(2) ........................................................................... 4, 24

40 C.F.R. § 230.3(1) ........................................................................................... 4

40 C.F.R. § 230.3(b) .......................................................................................... 4

40 C.F.R. §§ 1500.1-1508.28 ............................................................................ 2

40 C.F.R. §§ 1501.3-1501.4 .............................................................................. 3

50 C.F.R. Part 402 ......................................................................................... 5, 34

50 C.F.R § 402.02 ............................................................................. 6, 23, 31, 32

50 C.F.R. § 402.13(a) ........................................................................................ 6

50 C.F.R. § 402.14(a) ........................................................................................ 5

50 C.F.R. § 402.14(b)(1) ................................................................................... 6

50 C.F.R. § 402.14(c) ........................................................................................ 5

50 C.F.R. § 402.14(h)(3) ................................................................................... 6

50 C.F.R. § 402.16 ....................................................................................... 6, 34

51 Fed. Reg. 19,926, 19,933 (June 3, 1986) .................................................. 31

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| BSP | Big Sarasota Pass |
| CWA | Clean Water Act |
| CZMA | Coastal Zone Management Act |
| EA | Environmental Assessment |
| ER | Engineer Regulation |
| ESA | Endangered Species Act |
| FDEP | Florida Department of Environmental Protection |
| FONSI | Finding of No Significant Impact |
| GRBO | Gulf of Mexico Regional Biological Opinion |
| MMPA | Marine Mammal Protection Act |
| NED | National Economic Development |
| NEPA | National Environmental Policy Act |

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and the Court's Order (Doc. 33), the United States Army Corps of Engineers ("the Corps"), hereby opposes Plaintiff's Motion for Summary Judgment (Doc. 34) and cross-moves for summary judgment.

## I.    INTRODUCTION

This case involves a challenge to the Corps' efforts to prevent erosion of Lido Key's shoreline by placing sand dredged from Big Sarasota Pass's ebb shoal and placing it along Lido Key's shoreline. In evaluating options and developing plans, the Corps completed multiple environmental assessments that evaluated, *inter alia*, sand sources, Project alternatives, and design elements; conducted geotechnical and feasibility studies; and consulted with other federal agencies. Contrary to Plaintiff's claims, the Corps complied with its obligations under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370h, the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544, the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251-1388, and the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. §§ 1361-1423h. The Corps took the requisite hard look at potential impacts of its action and alternatives and determined the Project would not have a significant impact on the human environment, would have a number of benefits to the surrounding area, and was the best option. The Corps fully accounted for potential effects on threatened and endangered species, as well as effects on designated critical habitat potentially occurring in the Project area, and determined that its actions were not likely to adversely affect the manatee. The Corps' determinations were rational and are supported by the record. Plaintiff fails to carry its burden to show the Corps' action was arbitrary, capricious, or contrary to law, and therefore, the Corps respectfully requests this Court grant its cross-motion for summary judgment.

## II.    STATUTORY AND REGULATORY BACKGROUND

This case is brought under the Administrative Procedure Act ("APA"), which provides, in pertinent part, that "[a] person . . . adversely affected or aggrieved by agency action within the meaning of a relevant statute[] is entitled to judicial review thereof." 5 U.S.C. § 702. Under the APA "[t]he reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). A court's review under the APA is on the record submitted by the agency. *See id.* § 706(2)(E); *Pres. Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 (11th Cir. 1996). This case also includes claims against the Corps under the ESA's citizen-suit provision, 16 U.S.C. § 1540(g)(1)(A), which are also reviewed under the APA's deferential standard of review. *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 541 (11th Cir. 1996). Four environmental statutes underlie Plaintiff's claims against the Corps.

### A.    The National Environmental Policy Act

NEPA is a procedural statute that requires federal agencies to inform themselves of the environmental effects of proposed federal actions and consider reasonable alternatives before taking action. *City of Oxford, Ga. v. FAA*, 428 F.3d 1346, 1353 (11th Cir. 2005). NEPA does so not by imposing substantive requirements, but by creating a process to foster informed decisionmaking and public participation. *Black Warrior Riverkeeper, Inc. v. U. S. Army Corps of Eng'rs*, 354 F. Supp. 3d 1253, 1258-59 (N.D. Ala. 2018); *Fund for Animals, Inc. v. Rice*, 85 F.3d at 546. The Council on Environmental Quality, an agency created by NEPA in the Executive Office of the President, has issued regulations to guide agencies' compliance with the statute. 40 C.F.R. §§ 1500.1-1508.28.

2

To comply with NEPA, agencies often prepare an environmental assessment ("EA"), a "concise" public document which "briefly" discusses the environmental impacts of, and alternatives to, a proposed federal action. 40 C.F.R. § 1508.9. Agencies may use the EA to determine whether the proposed action will "significantly affect[ ] the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1501.3-1501.4. The EA should contain "sufficient evidence and analysis" for the agency to determine whether an Environmental Impact Statement ("EIS") is required. *Fund for Animals v. Rice*, 85 F.3d at 546. If the proposed action will have "significant" environmental impacts, NEPA instructs agencies to prepare an EIS, a detailed environmental review document analyzing the environmental impacts of the proposal, reasonable alternatives, and other factors. 42 U.S.C. § 4332(2)(C). If, however, the agency prepares an EA and concludes that the proposed action is *not* likely to have significant impacts, the agency may issue a finding of no significant impact, or "FONSI," and the NEPA process is complete. 40 C.F.R. § 1508.13; *Coastal Conservation Ass'n v. Gutierrez*, 2005 WL 2850325, *9 (M.D. Fla. 2005). A FONSI is a factual determination which "implicates substantial agency expertise and is entitled to deference." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 376 (1989).

### B.     The Clean Water Act

The CWA establishes a comprehensive program designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" and establishes as "a national goal . . . wherever attainable . . . water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water." 33 U.S.C. § 1251(a)(1)-(2). To achieve this goal, the CWA prohibits the discharge of dredged or fill material into navigable waters unless authorized pursuant to CWA Section 404. 33

U.S.C. § 1344. The CWA defines "navigable waters" as "waters of the United States," which, in turn, is defined by regulation to include waters used in interstate or foreign commerce and certain wetlands. 33 C.F.R. § 328.3(a).

The discharge of dredged and fill material into navigable waters generally requires a permit under Section 404. 33 U.S.C. § 1344. Under CWA Section 404(a), the Secretary of the Army is directed to regulate the discharge of dredged and fill material into waters of the United States. *Id.* § 1344(a); 33 C.F.R. Part 323. Section 404 also requires the United States Environmental Protection Agency to develop guidelines that the Corps must follow in evaluating and issuing permits for the discharge of dredged or fill material. 33 U.S.C. § 1344(b). These guidelines are known as the "404(b)(1) Guidelines" and are published at 40 C.F.R. Part 230. Although the Corps does not issue permits for its own activities, the Corps authorizes its own discharges of dredged or fill material by applying all applicable substantive legal requirements, including public notice, opportunity for public hearing and application of 404(b)(1) Guidelines.[1] 33 C.F.R. § 336.1(a); 33 C.F.R. § 335.2; 40 C.F.R. § 230.2(a)(2); 33 U.S.C. § 1344(r). The Corps' NEPA documentation and its Section 404(b)(1) evaluation constitute the functional equivalent of a permit.[2]

**C.    The Endangered Species Act**

---

[1] The 404(b)(1) Guidelines prohibit permits for which there "is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a). An "aquatic ecosystem" is defined as "waters of the United States, including wetlands, that serve as habitat for interrelated and interacting communities and populations of plants and animals." 40 C.F.R. § 230.3(b). "An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." *Id.* § 230.10(a)(2); *see id.* § 230.3(l).

[2] *See* Engineer Regulation  1105-2-100, https://www.publications.usace.army.mil/ USACE-Publications/Engineer-Regulations/u43546q/313130352D322D313030/.

The ESA provides for the listing of species as "threatened" or "endangered," [3] if warranted, as well as for the designation of "critical habitat." 16 U.S.C. § 1533(a). The ESA provides various protections for listed species. As relevant here, ESA Section 7 requires that federal agencies ensure that any action authorized, funded, or carried out by such agency is not likely to "jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary . . . to be critical . . . ." *Id.* § 1536(a)(2).[4] ESA Section 7 and its implementing regulations set out detailed consultation procedures designed to provide action agencies with expert advice to determine the biological impacts of their proposed activities. 16 U.S.C. § 1536(b); 50 C.F.R. Part 402. As an initial matter, the agency taking the action ("action agency") must determine whether its proposed action "may affect" an endangered or threatened species or its critical habitat. 50 C.F.R. § 402.14(a). Where the action agency determines that its proposed action has no effect on listed species or designated critical habitat, the consultation requirements are not triggered. *See id.*

If the action agency determines its action "may affect" a listed species or critical habitat, it is required to consult with the National Marine Fisheries Service ("NMFS") and/or the U.S. Fish and Wildlife Service ("FWS").[5] 50 C.F.R. § 402.14(a). If the determination is

---

[3] A "threatened species" is one "which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20). An "endangered species" is one "which is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6).

[4] The ESA defines "Secretary" to mean the Secretary of the Interior or the Secretary of Commerce, who in turn have delegated their responsibilities to FWS and NMFS, respectively. . . . *Id.* § 1532(15) . In general, FWS has authority over terrestrial species and NMFS has authority over marine species. *See, e.g., Nw. Res. Info. Ctr. v. NMFS*, 56 F.3d 1060, 1065 (9th Cir. 1995). Plaintiff in this action challenges the Corps' Section 7 compliance only as to consultation with NMFS.

[5] As referenced in the ESA implementing regulations, action agencies may include in their consultation requests a number of similar individual actions within a given geographic area, 50 C.F.R. § 402.14(c). As further explained in the Endangered Species Act Section 7 Consultation Handbook at E-13, *available at*

that the action may affect, but is not likely to adversely affect listed species or critical habitat, the action agency can proceed with informal consultation by obtaining FWS and/or NMFS's concurrence in that determination.[6] If the action may affect, and is likely to adversely affect listed species or critical habitat, the action agency must request formal consultation. "Formal" ESA consultation culminates in the issuance of a "biological opinion" by NMFS or FWS, which advises the action agency whether jeopardy is likely to occur for any listed species, whether critical habitat is likely to be destroyed or adversely modified, and, if so, whether "reasonable and prudent alternatives" exist to avoid a jeopardy or adverse modification situation. 50 C.F.R. § 402.14(h)(3).[7]

Primary responsibility for enforcement and implementation of the ESA is entrusted to officials of the federal government. *See, e.g.*, 16 U.S.C. § 1540(a), (b), and (e)(6). The ESA also contains a provision authorizing citizen suits "to enjoin any person, including the United States and any other governmental instrumentality or agency . . . who is alleged to be in

---

http://www.fws.gov/endangered/esa-library/pdf/esa_section7_handbook.pdf (last visited September 12, 2019), a "programmatic consultation" may address multiple actions on a program, regional, or other basis.

[6] Informal consultation "includes all discussions, correspondence, etc., between the Service and the Federal agency or the designated non-Federal representative prior to formal consultation, if required." 50 C.F.R § 402.02.If a federal agency determines, with written concurrence of the FWS or NMFS that the action "is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary." 50 C.F.R. § 402.13(a); *see also* § 402.14(b)(1) (action agency need not initiate formal consultation if it determines, after informal consultation, with written concurrence of FWS or NMFS, that proposed action is not likely to adversely affect listed species or critical habitat).

[7] After consultation on a proposed action has been completed, reinitiation of formal consultation is required "where discretionary Federal involvement or control over the action has been retained or is authorized by law" and one of four conditions is met, including:

> (a) If the amount or extent of taking specified in the incidental take statement is exceeded; (b) If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; (c) If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion; or (d) If a new species is listed or critical habitat designated that may be affected by the identified action.

50 C.F.R. § 402.16.

violation of any provision of [the Act] or regulation issued under the authority thereof . . . ." *Id*. § 1540(g)(1)(A). However, a citizen suit under Section 1540(g)(1)(A) may not be commenced "prior to sixty days after written notice of the violation has been given to the Secretary, and to any alleged violator of any such provision or regulation." *Id*. § 1540(g)(2)(A)(i).

### D.      The Marine Mammal Protection Act

The MMPA was enacted in 1972 based upon Congress's finding that "certain species and population stocks of marine mammals are, or may be, in danger of extinction or depletion as a result of man's activities." 16 U.S.C. §1361(1). The MMPA prohibits any person or vessel or other conveyance from taking "any marine mammal in waters or on lands under the jurisdiction of the United States." *Id*. § 1372(a)(2)(A). Similar to the ESA, the MMPA allows otherwise prohibited takings to be authorized under certain circumstances. *See, e.g.*, *Id*. § 1371(a)(5)(A)(i). The MMPA lacks any private right of action. Accordingly, any MMPA-related claims must be brought under the APA. *Haw. Cty. Green Party v. Clinton*, 124 F.Supp.2d 1173, 1195 (D. Haw. 2000) (holding that final agency action under the APA is required for judicial review of alleged violations of the MMPA).

### E.      The Administrative Procedure Act

The APA provides the standard of review applicable to this case, 5 U.S.C. § 706, and states that a court may set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). As the Eleventh Circuit has explained, "this standard is exceedingly deferential":

> Along the standard of review continuum, the arbitrary and capricious standard gives an appellate court the least latitude in finding grounds for reversal;

7

> '[a]dministrative decisions should be set aside in this context . . . only for substantial procedural or substantive reasons as mandated by statute, . . . not simply because the court is unhappy with the result reached.' The agency must use its best judgment in balancing the substantive issues.

*Fund for Animals v. Rice*, 85 F.3d at 541-42 (quoting *N. Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1538-39 (11th Cir. 1990)). The overarching question is whether the agency "examine[d] the relevant data and articulate[d] a 'rational connection between the facts found and the choice made." *Miccosukee Tribe of Indians v. United States*, 420 F. Supp. 2d 1324, 1331 (S.D. Fla. 2006) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)). Further, an agency's scientific determinations are entitled to greater deference. *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 103 (1983).

"The court's role is to ensure that the agency came to a rational conclusion, not to conduct its own investigation and substitute its own judgment for the administrative agency's decision." *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008) (internal quotation marks omitted); *see also Kleppe v. Sierra Club*, 427 U.S. 390, 410, n.21 (1976). A court reviewing an agency's compliance with NEPA under the APA "may only ask whether the agency took a "hard look" at environmental consequences." *Citizens for Smart Growth v. Sec'y of Dep't of Transp.*, 669 F.3d 1203, 1211 (11th Cir. 2012) (citation omitted). Plaintiff bears "the burden of showing by a preponderance of the evidence that the agency did not comply with NEPA's procedures." *Id.* (citation omitted). The scope of APA review is limited to the administrative record before the agency at the time the decision was made. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985). An agency's designation of the record is entitled to a presumption of regularity, and courts assume the record was properly designated "absent clear evidence to the contrary." *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th

Cir. 1993) (citation omitted); *see also Nat. Res. Def. Council, Inc. v. Van Antwerp*, No. 07-80444-CIV, 2008 WL 11333805, at *2 (S.D. Fla. Jan. 18, 2008).

## III.     FACTUAL BACKGROUND

### A.     Project Details

Lido Key is an approximately 2.5-mile-long, manmade, crescent-shaped, barrier island located on the Gulf of Mexico, along the western coast of Florida, about 45 miles south of the City of Tampa and 20 miles southeast of the mouth of Tampa Bay. AR23749, 3071. The island is in Sarasota County, within the City of Sarasota, Florida, and separated from the mainland by Sarasota Bay and the Intracoastal Waterway. AR23749. North of Lido Key is New Pass, a navigation channel that separates Lido Key from Longboat Key. AR23749. South of Lido Key is Big Sarasota Pass ("BSP") and the ebb shoal of the Pass. AR22986. Siesta Key, a natural barrier island, lies further south. *Id*. The BSP ebb shoal is adjacent to the south end of Lido Key. AR23759. In this area, sand typically drifts along the shorelines from north to south, and while it may drift north during storm events, currents, or tides, the net sand drift is to the south. AR23771, 22986.

The island of Lido Key was originally constructed in the 1920s. AR24482. Its shoreline has been eroding for decades, despite prevention efforts by the Corps and the City of Sarasota. AR22986, 23749, 23762, 23791, 24482. A federal beach erosion control project for Lido Key ("the Project") was authorized by Section 101 of the Rivers and Harbors Act of 1970, providing for initial construction and periodic nourishment for 1.56 miles of shoreline. 84 Stat. 1819; AR23749, 23831. However, the federally-authorized Project was never constructed and was subsequently de-authorized by Section 1001(b)(1) of the Water Resources Development Act

9

of 1986. Pub. L. No. 99-662 (b)(1), § 1001(b)(1), 100 Stat 4082 (1986). It was reauthorized by Section 364(2) of the Water Resources Development Act of 1999, provided that the Assistant Secretary of the Army for Civil Works determined the Project was technically sound, environmentally acceptable, and economically justified.[8] The Corps made such a determination in a Chief of Engineers Report dated December 22, 2004. The Water Resources Development Act of 2007 modified the Project authorization, directing the Corps to construct the Project substantially in accordance with the Chief of Engineers Report and to enter into a partnership agreement with the local non-federal interest.[9] The Chief of Engineers Report was based on a 2002 feasibility study and an EA, updated with an addendum in 2004, conducted to analyze the sand placement location and proposed structures built out into the water from the beach to prevent beach erosion or trap and accumulate sand, called groins.[10] AR4242-47, 3061-66, 23749. Attached Exhibits A-1 and A-2 are maps depicting the Project area.

Following preparation of the Chief of Engineers Report, surveys of the Project's

---

[8] Pub. L. No. 106-53, § 364(2)(A), 113 Stat 269 (1999). Upon its 1999 reauthorization, the project for shore protection at Lido Key was authorized "at a total cost of $5,200,000, with an estimated Federal cost of $3,380,000 and an estimated non-Federal cost of $1,820,000." *Id.* Congress also authorized "periodic nourishment for the project for a 50–year period at an estimated average annual cost of $602,000, with an estimated annual Federal cost of $391,000 and an estimated annual non-Federal cost of $211,000." *Id.* § 364(2)(B).

[9] Pub. L. 110-114, § 3049(a), 121 Stat. 1117-18 (2007). "The project for shore protection, Lido Key Beach, Sarasota, Florida, . . . is modified to direct the Secretary to construct the project substantially in accordance with the report of the Chief of Engineers dated December 22, 2004, at a total cost of $15,190,000, with an estimated Federal cost of $9,320,000 and an estimated non-Federal cost of $5,870,000, and at an estimated total cost of $65,000,000 for periodic nourishment over the 50-year life of the project, with an estimated age Federal cost of $30,550,000 and an estimated non-Federal cost of $34,450,000." *Id.* The Corps was required to "enter into a partnership agreement with the non-Federal interest in accordance with section 206 of the Water Resources Development Act of 1992 (33 U.S.C. 426i-1) for the modified project." *Id.* § 3049(b).

[10] Engineer Manual ("EM") 1110-2-1100, App. A, available at
https://www.publications.usace.army.mil/Portals/76/Publications/EngineerManuals/EM_1110-2-1100_App_A.pdf?ver=2014-03-10-140035-443 (A groin is a "[n]arrow, roughly shore-normal structure built to reduce longshore currents, and/or to trap and retain littoral material. Most groins are of timber or rock and extend from a SEAWALL, or the backshore, well onto the foreshore and rarely even further offshore.").

offshore sand sources indicated that sand from these areas would not meet the Florida Department of Environmental Protection's ("FDEP") sand compatibility criteria. AR23756. Accordingly, the Corps conducted a subsequent search to identify other suitable offshore sand sources, but could not identify any compatible offshore sources within an economically feasible distance of the Project. *Id*. In July 2018, the Corps prepared another EA to analyze sources for the Project, primarily from BSP, New Pass, or their ebb shoals; to further analyze the updated design of the groin features; and to determine whether significantly changed circumstances or significant new information would trigger supplemental analysis of the Corps' prior NEPA documentation. AR23756-58. Since plans for the design of sand placement had not changed since the 2004 addendum, the Corps did not re-examine the placement design. AR23756. The Corps' 2018 EA concluded that no significant changes or information warranted additional NEPA analysis, and the Corps issued a FONSI. AR23740-42.

> **B.      State Requirements and Administrative Process**

The Corps and FDEP use the FDEP permitting process as a means for the Corps to obtain both the state water quality certification required by Section 401 of the CWA, 33 U.S.C. § 1341, and concurrence with the Corps' consistency determination required by Section 307 of the Coastal Zone Management Act, 16 U.S.C. §1456. On December 22, 2016, the FDEP gave notice of its intent to issue a Consolidated Joint Coastal Permit which constitutes both Section 401 water quality certification and the Coastal Zone Management Act consistency concurrence. AR23756, 23813, 23843-882.

The Siesta Key Association and Plaintiff SOSS2, filed an administrative challenge to FDEP's proposed issuance of a Joint Coastal Permit. AR22984-85. The Florida Division of

Administrative Hearings held a multi-day hearing which included the testimony of several coastal engineering experts. The administrative law judge recommended upholding the proposed issuance of a Joint Coastal Permit, with modifications that would prohibit dredging operations in the area referred to as Cut B and the eastern-most 1,200 feet of Cut C from April to September to protect the spotted seatrout. Attached Exhibit A-2 provides a visual representation. Consistent with the administrative law judge's recommendation, FDEP issued the permit. AR22983-3058.

### C.   2018 EA/FONSI

In July 2018, the Corps issued the Final EA and the FONSI. AR23740-4676. In its planning efforts, the Corps followed its regulations, including the Economic and Environmental Principles for Water and Related Land Resources Implementation Studies, Engineer Regulation ("ER") 1105-2-100, which provides:

> Contributions to national economic development (NED) are increases in the net value of the national output of goods and services, expressed in monetary units. Contributions to NED are the direct net benefits that accrue in the planning area and the rest of the Nation. Contributions to NED include increases in the net value of those goods and services that are marketed, and also of those that may not be marketed.
>
> *                *                *
>
> A plan that reasonably maximizes net national economic development benefits, consistent with the Federal objective, is to be formulated. This plan is to be identified as the NED plan.

ER 1105-2-100 at 1-2. The Corps recommends the NED plan "unless the Secretary of the department or head of an independent agency grants an exception to this rule. Exceptions may be made when there are overriding reasons for recommending another plan, based on other Federal, State, local and international concerns." *Id*. at 1-3.

The recommended plan in the 2018 EA/FONSI builds off the NED plan identified in

the 2002 EA (with 2004 addendum). Through its planning process for the Project, the Corps identified a NED plan in the 2002 EA (with 2004 addendum). AR3263; *see* Fig. 1 and 2. Various berm width extensions, and volumes required for each, were considered in the formulation of the NED plan. AR3238. The NED plan consisted of:

> sand placement of an 80-foot beach berm and an additional advanced nourishment section averaging 96-feet wide (for a total of 176 feet) over 1.56 miles of shoreline with a groin field at the southern limits of the project [, with p]eriodic nourishment . . . at approximately 5-year intervals for 50 years of Federal participation . . . Three groin features . . . : a northern structure located near survey monument R-42.5 and extending 320 feet seaward; a middle structure 1400 feet south of the northern structure (near R-43) and extending 440 feet seaward; and a terminal groin structure 800 feet south of the middle structure (near BSP) and extending 650 feet seaward.

AR23749-53, 3263-64.

The 2002 EA (with 2004 addendum) identified the NED plan as the recommended plan. AR3061-66. The 2018 EA/FONSI made no changes to the sand placement, but reduced the length of the northern and middle groins. AR23751. The 2018 plan also included impounding a large volume of material to the north of the southern groin to guard against excessive downdrift erosion that could be caused by the much longer northern and middle groins that were recommended in the 2002 EA (with 2004 addendum).[11] AR23749-53. As discussed above, it also addressed sand sources that met FDEP regulations. AR23753-54. Both the BSP ebb shoal and the New Pass federal navigation channel and ebb shoal were identified as potential sand sources. AR23765.

---

[11] The minor design changes in the 2018 EA/FONSI are consistent with the Corps' regulation for its civil works projects and still build off the NED plan identified in the 2002 EA (with 2004 addendum). *See* ER 1105-2-100, Par. 4-1b(3), available at
https://www.publications.usace.army.mil/Portals/76/Publications/EngineerRegulations/ER_1105-2-100.pdf?ver=2013-09-08-233404-497.

The Corps and the City of Sarasota entered into a Project Partnership Agreement for construction of the Project, applying the cost-sharing requirements applicable to the Project under Section 103 of the Water Resources Development Act of 1986, Pub. L. 99-662, *as amended* (codified at 33 U.S.C. § 2211) on September 20, 2018. [12] AR24938; AR24941. SOSS2 was actively engaged with the Corps throughout the planning process.[13] On September 28, 2018, SOSS2 provided the Corps with a notice of intent to bring a civil action in federal court to compel agency action pursuant to the APA, 5 U.S.C. § 706, alleging that the Corps violated NEPA, the CWA, and ESA, which in turn allegedly resulted in APA violations (attached as Exhibit B).

### D.    Current Litigation

On January 11, 2019, SOSS2 filed the present complaint requesting that, pursuant to the APA, the Court: (1) declare that the Corps' issuance of an EA/FONSI was based on outdated and/or incomplete information and thus in violation of NEPA, CWA, and ESA and that the Corps was required to complete an EIS instead of an EA; (2) enjoin further action on the Project and prohibit allocation of funding until the Corps is found to be in compliance with NEPA, the CWA, and the ESA; and (3) award SOSS2's costs of litigation pursuant to the Equal Access to Justice Act. Doc. 1.

### E.    Project Status

The Corps completed the design of the initial construction on July 10, 2019 and

---

[12] *See* 42 U.S.C. § 1962d-5b(a)(1) (providing that the Secretary not commence construction of any water resources project until a non-federal sponsor has entered into a written agreement to furnish its required cooperation for the project).

[13] *See*, *e.g.*, AR19183-86, 24008-315, 19618, 12959, 12967, 13017-18, 13020, 13147-48, 17111-12, 17121-22, 17132-33, 17136-47, 17149-58, 17163-69, 17173-74, 17181-82, 17245, 17251, 17274, 17288-89, 17395-96.

advertised the construction on May 16, 2019. Bidding closed on July 30, 2019. However, all bids were outside of the awardable range and no contract was awarded. As a result, the Corps is refining the design in order to re-advertise the contract with the goal of receiving bids within the awardable range. Currently, the Corps expects to award a contract by mid-February. Upon award, the estimated duration of the initial construction work including dredging and initial sand placement is approximately 275 days.

## IV.   ARGUMENT

### A.   The Corps has Satisfied Requirements of NEPA.

An EA is intended to "provide[ ] sufficient information to the district commander on potential environmental effects of the proposed action and, if appropriate, its alternatives, for determining whether to prepare an EIS or a FONSI." 33 C.F.R. § 230.10(a) (citing 40 C.F.R. § 1508.9); s*ee also Ga. River Network v. U.S. Army Corps of Eng'rs,*, No. 10-cv-267, 2012 WL 930325, at *10 (S.D. Ga., Mar. 19, 2012) (quoting 40 C.F.R. § 1508.9(b)), *aff'd* 517 F. App'x 699 (11th Cir. 2013). Here, the Corps thoroughly reviewed and considered the Project's design features, sand sources, alternatives, and potential environmental effects through multiple EAs, an analysis specifically studying the groin structures, and a feasibility study. After thoroughly reviewing its findings, considering alternatives, and soliciting public comment, the Corps concluded that the Project would not have significant impacts on the environment. The Corps' consideration and analysis more than satisfy NEPA's requirements.

### 1.   *The Corps Took A Hard Look at Potential Effects of the Project.*

NEPA's implementing regulations require an agency to consider the effects of its action, which include "ecological [ ], aesthetic, historic, cultural, economic, social, or health, whether

direct, indirect, or cumulative." 40 C.F.R. § 1508.8.

a.    <u>The Corps examined potential environmental effects.</u>

Contrary to Plaintiff's assertions, Doc. 34 at 14-16, the Corps conducted a thorough review of potential environmental effects resulting from the Project, including potential impacts on migratory birds, marine mammals, fish species, threatened and endangered species, and water quality. AR23770-799; AR23808-811. As discussed in Section C.2 below, the Corps engaged in numerous consultations with NMFS and FWS regarding potential impacts to federally-protected species. AR23924. Additionally, the Corps conducted its own analysis, such as geotechnical surveys to identify sand suitable for placement at sea turtles' nesting grounds in the Project area, AR23614-15, AR23793-94; AR23945-65; AR23970-74; AR23984-90; AR24004; and App. I (AR24658-24676) (analyzing impacts of the Project on sea turtles and discussing mitigation and monitoring plan); and ensured the Project's compliance with Florida's Coastal Zone Management Plan, including incorporation of environmental protection measures during both construction and maintenance. AR23838-41 (discussing compliance with state coastal zone management plan. The Corps considered and implemented conditions to minimize potential impacts. AR23792-95 (discussing mitigation conditions for manatees, fish spawning in Big Sarasota Pass, and sea turtles); AR23624 (analyzing cumulative impacts and finding no significant impact).

Plaintiff is incorrect in its assertion that the Corps failed to take a hard look at periodic discharges of pollutants into the aquatic ecosystem because the Project involves no such discharge. Doc. 34 at 9. Rather, the sediment involved in both the dredging and placement of materials on Lido Key's beach is clean sand that meets state standards for compatibility. *See* App. H of 2018 EA, AR24501-06 (documenting the characteristics of the proposed sediment and its compatibility

16

with existing sediment on Lido Key). Plaintiff's assertion that the Corps failed to consider spotted

seatrout, Doc. 34 at 15-16, is also inaccurate. The 2018 EA includes the spotted seatrout in its list

of fish that utilize the Project area, and the Corps again considered spotted seatrout in its Seagrass

Mitigation Monitoring Plan. AR23774, 24675. While there are no state or federal laws that require

mitigation for impacts to spotted seatrout, the Corps implemented steps to minimize impacts on

spawning and foraging, *see* AR23793 (discussing a stop in dredging from April to September to

allow fish ingress and egress to Sarasota Bay), and included mitigation of 2.9 acres of seagrass

habitat at the Perico Seagrass Mitigation Basin, to provide additional spawning areas. AR23797.

The Corps fully disclosed and considered these potential impacts as required by NEPA. Moreover,

the Corps concluded that none of the impacts were significant under NEPA. Plaintiff's argument

assumes that NEPA prohibits agency action if the analysis identifies potential adverse impacts.

Plaintiff's argument is wholly inconsistent with NEPA and therefore fails.

b.     The Corps examined potential economic effects of the Project.

Plaintiff's claim that the Corps failed to consider the Project's impacts on Siesta Key's

economy, Doc. 34 at 10, is unsupported. The Corps considered the fact that the Project's shoreline

is "significantly developed," AR23818, and that "protection of the infrastructure located along this

[ ] shoreline is the reason [the Project] was authorized by Congress." AR23818. The 2018 EA

noted that recreational activities take place near the proposed dredge areas and in the nearshore

region of the beach placement area, and concluded that the Project would enhance recreational

opportunities and have a positive impact on the area's economy. AR23609-10, 23741, 23839.

While the Corps found that the presence of dredging equipment would be a temporary impact to

the aesthetics of BSP's ebb shoal during construction, it concluded that aesthetics would return

17

immediately following the end of dredging. AR23790. The Corps also considered that dredging the ebb shoal "would result in deeper depths along portions of the shoal currently used for anchoring and swimming due to its shallow depths . . . [but that because] only a small portion of the shallow depth areas within the ebb shoal are proposed for dredging, this should not have a significant adverse effect on recreational use of the ebb shoal." AR23801.

The Corps conducted extensive modeling to ensure that dredging BSP's ebb shoal would not impact sediment transport to Siesta Key beaches, and determined that: (1) mining the ebb shoal would not interfere with the littoral drift that transports sand to Siesta Key beaches; and (2) would "not result in any additional sediment over the background levels" that bypass the BSP ebb shoal, moving on to Siesta Key. AR23790-91. The Corps determined the Project would result in decreased erosional pressure and decreased wave energy along Siesta Key's northern interior shoreline, factors that protect rather than detract from Siesta Key's beaches. AR23791, 23818, 19810. Notably, Plaintiff does not identify the allegedly "critical" information about economic impacts the Corps failed to consider. *See* Doc. 34 at 10. This is because, contrary to Plaintiff's assertion, the Corps took a hard look at potential economic impacts of the Project, and considered and addressed public input regarding economic impacts. AR23821, App. D of EA/FONSI (AR24008-309).

c.    <u>The Corps examined potential navigation effects</u>.

Plaintiff also mistakenly argues that the Corps failed to examine potential navigation effects. Doc. 34 at 10. However, the Corps evaluated navigation routes around the Project area using the Coastal Modeling System, which specifically analyzes navigation channel performance and sediment exchange. AR23760. The Corps concluded that "the inlet channel of [Big Sarasota

18

Pass] has steadily migrated southward for years, and the channel has cut into the south bank along the northern interior shoreline of Siesta Key . . . [which] compresses the width of the channel, and causes currents through the channel to strengthen in velocity." AR23609. The Corps concluded that the Project would result in a number of positive impacts on navigation, including "a reduction of shoaled sediments in the main navigational ebb channel," AR23800, and reduced currents through the Big Sarasota ebb channel, which would make the channel more easily navigable. AR23769. Plaintiff's unsubstantiated assertion is directly contradicted by the administrative record and must be rejected.

### 2.   *The 2018 EA Properly Addresses All Cumulative Impacts.*

Agencies must consider the direct, indirect, and cumulative impacts bearing on a proposed action. 40 C.F.R. § 1508.25(c)(3). A cumulative impact is "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. The Corps considered potential cumulative impacts of the Project with past projects in the area as well as potential future projects, and found that excavation of Lido Key would not have significant cumulative impacts on environmental conditions in the Project area. AR23803-06.

### 3.   *The Corps Analyzed Baseline Conditions.*

The 2018 EA analyzed the volume and shape of the ebb shoal at Big Sarasota Pass as far back as 1883. AR23770. Using modeling technology, the Corps determined that little had changed in the ebb shoal's volume and shape since that time, and that removal of the 1.3 million cubic yards of sediment needed for the Project was possible and would not change its planform area. AR23770-

71. The Corps also consulted various biological opinions that examined baseline conditions of "all areas to be affected directly or indirectly by the action," AR23886, and potential impacts to species of concern in the Project area. AR23883-916. Plaintiff's argument that the biological opinions fail to include baseline information on impacts to the hydro-ecology and local economy fail, particularly because the purpose of a biological opinion is to study impacts on species. As for NEPA, the Corps also analyzed the baseline as to all features. *See* AR23770-89, 23806, 23836.

### 4.     *The Corps Reasonably Relied on Recent Data and Analyses.*

Plaintiff's argument that the Corps acted in an arbitrary and capricious manner because it did not conduct a new EIS for the Project, Doc. 34 at 11-15, is irrelevant. The Corps completed an EIS for the Project in 1984, and conducted further analysis in its subsequent EAs. It conducted an EA in 2002 (with 2004 addendum) and in 2018. In these analyses, the Corps considered a number of other studies analyzing specific components of the Project, such as impacts on the human environment and incorporated those findings. *See* AR19809-12. These studies were more than sufficient to inform the Corps' decision and determine that the Project would not have a significant impact. Plaintiff failed to identify any significant impacts or any significant new information that required an EIS. As a result, the Court should deny Plaintiff's motion on that issue.

### 5.     *The Corps Considered a Reasonable Range of Alternatives.*

In conducting an EA, an agency must consider a "reasonable" range of alternatives to the proposed action. 42 U.S.C. § 4332(2)(E); 40 C.F.R. § 1508.9(b). This requirement is "bounded by some notion of feasibility[,]'" however, *Druid Hills Civic Ass'n, Inc. v. Fed. Highway Admin.*, 772 F.2d 700, 713 (11th Cir. 1985) (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 551 (1978)), and as the Supreme Court has stated, a

"'detailed statement of alternatives' cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man or . . . because [it] failed to ferret out every possible alternative . . . [.]'" *Vt. Yankee*, 435 U.S. at 551. Moreover, NEPA requires a more rigorous level of analysis in an EIS than when the agency has determined on the basis of its EA that the action will not result in significant environmental impact. *Sierra Club v. U.S. Army Corps of Eng'rs*, 464 F. Supp. 2d 1171, 1227 (M.D. Fla. 2006) (citing *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005), *aff'd* 508 F.3d 1332 (11th Cir. 2007); *Save Our Cumberland Mountains v. Kempthorne*, 453 F.3d 334, 342 (6th Cir. 2006); *Mo. Mining, Inc. v. Interstate Commerce Comm'n,* 33 F.3d 980, 984 (8th Cir. 1994)).

The Corps' 2018 EA evaluated several alternatives, including taking no action, varying groin lengths, and alternative sand sources, such as the BSP ebb shoal, the New Pass federal navigation channel, offshore sand sources, and upland sources. *See* AR 23751, 24339-425 and 23580-24500 (evaluating ten sediment mining alternatives for the Project); AR23764 (considering the use of upland, aragonite, and other distant sand sources for beach fill). This analysis included comparing each alternative in light of their impacts to, *inter alia*, environmental factors, cultural resources, navigation, and recreation. AR23589-90.

Plaintiff claims that the Corps did not consider a reasonable range of alternatives because it failed to consider an alternative that did not require dredging. Doc. 34 at 14. First, Plaintiff ignores the clear legal precedent requiring that an agency's consideration of alternatives is bounded by a feasibility factor.  Plaintiff instead just identifies alternatives that it would have chosen and faults the Corps for failing to analyze them. Notably, Plaintiff's newly-proposed alternatives suffer

from a number of defects. For example, its suggestion that the Corps haul sand from a sand mine ignores the potentially harmful environmental impacts of hauling thousands of pounds of sand up and down the beach, as well as suitability questions. The Corps thoroughly examined a broad range of alternatives, and concluded that dredging BSP's ebb shoal outperformed other alternatives.

### 6.     *The Corps Examined Mitigation Related to the Project.*

Agencies are required to examine mitigation in their NEPA analyses. 40 C.F.R. §§ 1502.14(f), 1502.16(h). The Council on Environmental Quality defines mitigation in several ways, including "compensating for the impact by replacing or providing substitute resources or environments." 40 C.F.R. § 1508.20(e). The Corps' analysis and consultations show that the Project is not expected to have significant adverse environmental effects and therefore does not require the need for many mitigating measures. AR23761. The one area where the Corps determined mitigation was necessary involves seagrasses in the sand source area. AR23797. As reflected in its CWA Section 401 water quality certification from the Florida Department of Environmental Protection, the Corps will engage in mitigation and monitoring for seagrass in compliance with a monitoring plan designed specifically for the Project. AR23797-98, 23873-76 (discussing mitigation plans).

### 7.     *The Corps' Decision Was Reasonable and Supported by the Record.*

The Corps based its plans for the Project on its own analysis and expertise, consultation with other agencies and organizations with knowledge of the resources involved in the Project area, and public comment, resulting in a thorough consideration of all relevant factors. AR23740-4676. It determined that the Project would not have any significant impacts, and that a FONSI was appropriate for the Project. AR19807. The Corps' NEPA regulations permit district commanders

to consider the use of an EA if early studies and coordination show that a particular action is not likely to have a significant impact on the quality of the human environment. ER 200-2-2.[14]

In reviewing an agency's compliance with its NEPA obligations, a court's role is to ensure that the agency "has taken a 'hard look' at the environmental consequences of a proposed action" and its alternatives." *Druid Hills Civic Ass'n*, 772 F.2d at 709 (citation omitted). Here, the record clearly shows that the Corps thoroughly considered all relevant factors, its decision to move forward with dredging sand from BSP and its placement areas along Lido Key's shoreline are supported by the data collected, and the Corps clearly articulated how its studies of sand flow and environmental analysis demonstrated the Project with the proposed sand source as the best action. For these reasons, Plaintiff's argument fails and the Court should grant the Corps' motion for summary judgment.

### B.     The Project Is Consistent With The Clean Water Act.

In a wholly conclusory and cursory fashion, Plaintiff alleges that the Corps' CWA Section 404(b)(1) Guidelines analysis "fails to include specific baseline conditions, and therefore a determination of compliance with § 404 of the CWA is arbitrary and capricious." Doc. 34 at 17 (citing the EA/FONSI in its entirety).[15] Plaintiff argues, without more explanation, that the Corps' factual determination required by 40 C.F.R. § 230.11 is "incomplete" because it fails to recognize and discuss "baseline turbidity at the disposal sites and the borrow areas, as well as baseline presence of hydrocarbon pollutants resulting from

---

[14] *See* Engineer Regulation, https://www.publications.usace.army.mil/USACE-Publications/Engineer-Regulations/?udt_43546_param_page=9.

[15] Plaintiff oddly cites the definition section of the Endangered Species Act implementing regulation, 50 C.F.R. § 402.02, as support for this argument. The cited regulation is not applicable to CWA section 404(b)(1) Guidelines analyses.

regular boat traffic prior to the impetus of the Project." Doc. 34 at 17.

First, Plaintiff misapprehends the scope the 404(b)(1) Guidelines analysis. As noted above, CWA Section 404(a) provides for the Corps' to issue permits "for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. § 1344(a). Though the Corps does not issue permits for its own discharge of dredging material into navigable waters, it applies the 404(b)(1) Guidelines as it would in issuing a permit. 33 C.F.R. § 336.1(a); 33 C.F.R. § 335.2; 40 C.F.R. § 230.2.a.2; 33 U.S.C. § 1344(r). The 404(b)(1) Guidelines provide that "no *discharge of dredged or fill material* shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a) (emphasis added). The scope of this analysis is limited to the "discharge of dredged or fill material," and does not apply to either "borrow areas" or the "presence of hydrocarbon pollutants from regular boat traffic," Doc. 34 at 17, presumably in the water throughout the area, as Plaintiff mistakenly suggests. The analysis and required written determination is limited to the impacts of the discharge of dredged material into navigable waters. 40 C.F.R. § 230.10(a).[16]

Specifically, the Corps is required, pursuant to 40 C.F.R. § 230.11, to "determine in writing the potential short-term or long-term effects of a proposed discharge of dredged or fill material on the physical, chemical, and biological components of the aquatic environment in light of subparts C through F. Such factual determinations shall be used in § 230.12 in making

---

[16] Plaintiff also mistakenly suggests that the decision at issue has a 50 year duration and involves the permanent stationing of dredging equipment for 50 years. Doc. 34 at 11 That is incorrect. Although it is understood that Congressional authorization extends to additional beach renourishment at 5-year intervals for the next 50 years, funds have not been appropriated and the Corps' has made no decision as to the future projects.

findings of compliance or non-compliance with the restrictions on discharge in § 230.10." 40 C.F.R. § 230.11(a). Plaintiff's sole allegation regarding the sufficiency of the 404(b)(1) analysis is an alleged failure to identify "baseline conditions" as to turbidity. Doc. 34 at 17. Plaintiff is incorrect. Section 3 of the EA:

> describes the existing environmental resources of the areas that would be affected if any of the alternatives were implemented. This section describes only those environmental resources that are relevant to the decision to be made. It does not describe the entire existing environment, but only those environmental resources that would affect or that would be affected by the alternatives being considered if they were implemented. This section, in conjunction with the description of the "No Action" alternative, forms the baseline conditions for determining the environmental impacts of the proposed action and reasonable alternatives.

AR23770. Thus, as an initial matter, the Corps did fully consider the effects of various alternatives on the existing environment.

Plaintiff seems to believe that the Corps' Section 404(b)(1) Guidelines analysis is insufficient as to the turbidity, particularly a failure to consider the "baseline turbidity," Doc. 34 at 17. Turbidity is an optical determination of water clarity.[17] Turbid water can appear cloudy, murky, or otherwise colored, affecting the physical look of the water. In that regard, the Corps considered the effects of placement of dredged material at the disposal sites, as required by the 404(b)(1) Guidelines, the Corps "[d]etermine the nature and degree of effect that the proposed discharge will have, individually and cumulatively, in terms of potential changes in the kinds and concentrations of suspended particulate/turbidity in the vicinity of the disposal site." 40 C.F.R. § 230.11(c). The Corps found that "[t]he placement of fill on the beach

---

[17] *See*, *e.g.*, EM 1110-2-5025 at 2-58, App. B-1, available at https://www.publications.usace.army.mil/Portals/76/Publications/EngineerManuals/EM_1110-2-5025.pdf; Overview of controlling factor: Turbidity, available at https://www.nwp.usace.army.mil/Estuary/Factors/Turbidity/

will increase turbidity in the nearshore area. Because the immediate nearshore area is a high energy system and subject to naturally-occurring elevated turbidity, increases due to the project will not be significant. Fill placement will have no long-term or significant impacts, if any, on salinity, water chemistry, clarity, color, odor, taste, dissolved gas levels, nutrients or eutrophication." AR28333; *see also* AR23796. In the vicinity of the disposal sites, "[t]here will be a temporary increase in turbidity levels in the project are during discharge. Turbidity will be short term and localized and no significant adverse impacts are expected." *Id*. Most importantly, "State standards for turbidity will not be exceeded." *Id*.[18]

Thus, the Corps' 404(b)(1) Guidelines analysis is complete, reasonable, and well supported by the record. Plaintiff has failed to demonstrate otherwise.

### C.     The Corps Complied With the ESA.

Plaintiff's ESA claims must be dismissed for failure to provide the requisite notice of intent to sue pursuant to the ESA citizen suit provision. In the alternative, assuming the notice provided is deemed legally sufficient, the Corps fully accounted for potential project effects on threatened and endangered species and designated critical habitat potentially occurring in the Project area through the ESA Section 7 consultation process with both FWS and NMFS. For example, the Corps determined that its action may affect, but is not likely to adversely

---

[18] Florida water quality regulations also require that water quality standards not be violated during construction operations (as opposed to the impact of the completed project). "Dredging beach-quality sand from inlets and related channels, or restoration/nourishment of beaches and the use of offshore borrow areas" cannot be permit in Outstanding Florid Waters unless "[t]urbidity at the edge of the approved mixing zone does not exceed natural background levels by more than the range in natural background turbidity levels measured throughout a normal tidal cycle for the applicable sand dredging or beach restoration/nourishment site; and in no case shall it exceed 29 [nephelometric turbidity units] above natural background." Fl. Admin. Code Ann. 62-4.242(2)(b)2 (2016). If turbidity exceeds State water quality standards as determined by monitoring, the contractors will be required to cease work until conditions return to normal.

affect the manatee. That determination is rational and supported by the record, contrary to Plaintiff's arguments.

### 1. Plaintiff Failed To Provide the Requisite Notice.

As a threshold matter, the Corps properly acted in reliance on biological opinions issued by FWS and NMFS, respectively to demonstrate ESA compliance as to the actions challenged by Plaintiff in the Third Claim for Relief, Doc. 1 at ¶¶ 75-82. In *Bennett v. Spear*, 520 U.S. 154, 173 (1997), the Supreme Court recognized that such claims challenging an action agency's decision to rely on a biological opinion are subject to the ESA's citizen suit provision, 16 U.S.C. § 1540(g)(1)(A). Citizen suits under Section 1540(g)(1)(A) may not be commenced "prior to 60 days after written notice of the violation has been given to the Secretary, and to any alleged violator of any such provision or regulation." 16 U.S.C. § 1540(g)(2)(A)(I).[19] Under analogous environmental statutes, the Eleventh Circuit has held that such a notice requirement establishes a mandatory pre-condition to filing suit and consequently, failure to provide such notice requires dismissal of the claim. *Am. Canoe Ass'n v. City of Attalla*, 363 F.3d 1085, 1087 (11th Cir. 2007); *Nat'l Envtl. Found. v. ABC Rail Corp*, 926 F.2d 1096, 1097-98 (11th Cir. 1991); *see also Hallstrom v. Tillamook Cty.*, 493 U.S. 20, 33 (1989) (notice requirement under similar statute is condition precedent for suit).[20]

---

[19] The notice provisions of environmental statutes serve a two-fold purpose of giving the alleged violator an opportunity to remedy the alleged violations and giving the federal agencies with statutory enforcement powers an opportunity to commence their own enforcement action.) *Nat'l Envtl. Found.,* 926 F.2d at 1099; *Hawksbill Sea Turtle v. FEMA*, 126 F.3d 461, 473 (3d Cir. 1997). *See also Nat'l Parks & Conservation Ass'n, Inc. v. Tenn. Valley Auth.,* 502 F.3d 1316, 1329 (11th Cir. 2007) ("The notice requirements are strictly construed to give the alleged violator the opportunity to correct the problem before a lawsuit is filed.").
[20] Although some courts have held that the notice provisions of environmental statutes such as the ESA are jurisdictional, *see e.g., Sw. Ctr. for Biological Diversity v. United States Bureau of Reclamation*, 143 F.3d 515, 520 (9th Cir. 1998), the Court of Appeals for the Eleventh Circuit has observed that the CWA's notice requirement "is more procedural than jurisdictional." *Am. Canoe Ass'n*, 363 at 1088. For purposes of this motion, it is unnecessary to determine whether the notice requirement is deemed procedural or jurisdictional,

Plaintiff's notice letter (Exhibit B) was addressed to the Corps, but not the Secretaries of the U.S. Department of the Interior or Commerce, as required pursuant to 16 U.S.C. § 1540(g)(2)(A)(I). Moreover, the notice letter does not allege violations with respect to any ESA-related determinations except for the "not likely to adversely affect" determination concerning the manatee resulting from the Corps' consultation with FWS.[21] Since Plaintiff has not satisfied the mandatory notice prerequisite, the Court should grant summary judgment in favor of the Corps as to Plaintiff's Third Claim for Relief.[22] However, even if Plaintiff had provided the requisite notice, its ESA claims would fail on the merits.

> 2. *The Corps Completed ESA Consultations With FWS and NMFS To Determine Project Effects In the Project Effects Both On Lido Key and in the Marine Environment In the Vicinity of the Sand Sources.*

In its biological opinion dated December 29, 2016, FWS analyzed the potential effects of the Project on numerous threatened and endangered species. FWS concurred with the Corps' determination that the Project may affect, and is not likely to adversely affect the endangered West Indian manatee. AR23888. FWS also concluded that the project is not likely to jeopardize the continued existence of the red knot; and the loggerhead, green, leatherback, hawksbill, and Kemp's ridley sea turtles. AR23905. FWS concluded that ESA coverage as to potential effects

---

because in either case it is a "mandatory condition precedent to commencing suit that the district courts may not disregard." *Id.* at 1087 (citing *Hallstron*, 493 U.S. at 30).

[21] Thus, even if Plaintiff's notice letter were deemed legally sufficient as to manatee-related claims, the following claims are still subject to dismissal because they are not addressed in any fashion in the notice letter: (1) claims concerning the sufficiency of its ESA consultation with FWS as to species other than the manatee; and (2) claims concerning the sufficiency of its ESA consultations with NMFS as to all marine species under NMFS's jurisdiction. *See* Doc. 34 at 23-29.

[22] Plaintiff's failure to provide the requisite notice cannot be cured by, for example, presenting the Corps and the Secretaries of the Interior and Commerce with an updated notice and then waiting sixty days before filing a supplemental complaint. *Building Indus. Ass'n v. Lujan*, 785 F. Supp. 1020, 1022 (D.D.C. 1992) (noting that the notice requirement cannot be cured "by either a 60-day stay of the case or by applying equitable tolling principles"). *See also Forest Guardians v. U. S. Bureau of Reclamation*, 462 F. Supp. 2d 1177, 1186 (D.N.M. 2006); *Moden v. U.S. Fish & Wildlife Serv.*, 281 F.Supp.2d 1193, 1206 (D. Or. 2003).

on the piping plover would be conferred by the 2013 Programmatic Piping Plover Biological Opinion ($P^3BO$).[23] AR23885.

ESA coverage for threatened and endangered marine species under NMFS's jurisdiction, including the sei whale, sperm whale, finback whale, humpback whale, hawksbill turtle, Kemp's ridley turtle, green sea turtle, leatherback turtle, smalltooth sawfish, and the manatee (while in the ocean) is provided by the 2003 Regional Biological Opinion on Hopper Dredging of Navigational Channels and Borrow Areas in the Gulf of Mexico, *available at* https://www.fisheries.noaa.gov/content/endangered-species-act-section-7-biological-opinions-southeast, as revised and supplemented in 2005, 2007, and 2016, respectively. AR23945. This biological opinion as amended and supplemented to date is currently referred to as the Gulf of Mexico Regional Biological Opinion ("GRBO"). *See* AR23794.

The Corps reasonably relied on the expert determinations rendered by FWS and NMFS, respectively, through the ESA consultation process. Indeed, Plaintiff does not directly challenge the findings of either agency. As further explained below, the Corps fully complied with its substantive and procedural obligations under the ESA by acting in reliance on the species-related determinations of FWS and NMFS.

3.     *The Corps Adequately Considered Potential Project Effects On Seagrasses.*

The Corps documented 5.71 acres of seagrass in the project area including 1.68 acres within borrow areas. To address potential effects on seagrass as well as hardbottom habitats, the Corps completed essential fish habitat consultation with NMFS pursuant to the Magnuson-

---

[23] A*vailable at* https://www.fws.gov/northflorida/Guidance-Docs/20130522_ltr_Service_Corps_Piping%20Plover%20Programmatic_BO_FINAL.pdf.

Stevens Act, 16 U.S.C. §1855 (b)(4)(A). AR23782-85. NMFS concluded that "[b]ased on our review of the June 20, 2018, FDEP Permit and December 2016 Lido Key HSDR Project Seagrass Mitigation and Monitoring Plan, we anticipate any adverse effects that might occur on marine and anadromous fishery resources would be minimal and, therefore, do not have any essential fish habitat (EFH) conservation recommendations to offer regarding these activities." AR23883-935. NMFS did not make project-specific recommendations concerning potential effects on seagrasses specifically in the ESA context; however, NMFS provided programmatic ESA coverage for the dredging activities here through the 2003 Regional Biological Opinion on Hopper Dredging of Navigational Channels and Borrow Areas in the Gulf of Mexico ("GRBO"), as described above. The GRBO addressed effects of dredging on seagrasses and other food sources for ESA-listed species. *See* GRBO at 52-53. Plaintiff has not challenged that biological opinion. In sum, the Corps adequately accounted for potential project effects on seagrasses and other food sources for ESA-listed species both in the EFH and ESA contexts, and no further coordination with NMFS is necessary.

4.     *The Corps Considered Potential Project Effects On Designated Critical Habitat Through Consultations With FWS and NMFS.*

Although the biological opinion does not specifically address Siesta Key in assessing the potential effects of the project, the action area of the FWS biological opinion includes "all areas to be affected directly or indirectly by the action and not merely the immediate area involved in the action." AR23886. This action area included "downdrift areas likely to be affected." *Id.* FWS also included "reasonable and prudent measures" in the incidental take statement for sea turtle protection including restrictions on sand placement activities during certain times of the day during nesting season. AR23909-14. As a matter within FWS's

scientific expertise, the identification of the appropriate action area is owed deference. *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1222 (11th Cir. 2002). Accordingly, "in order for the Court to find that the Agencies' decision was arbitrary and capricious, the Court must find that 'a clear error in judgment' was committed." *Nat. Res. Def. Council v. Nat'l Park Serv.*, 250 F. Supp. 3d 1260, 1302 (M.D. Fla. 2017) (citing *N. Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1538 (11th Cir. 1990)). The Corps adequately considered potential effects on sea turtles from both erosion and accretion through FWS consultation and reasonably decided to incorporate the RPMs recommended by FWS as conditions of the Corps permit. AR23794, 23812. *See also* AR23809-10; AR23853-55; AR23834; AR23859-62; AR23883-23935.

     5.    *The Corps Addressed Potential Cumulative Effects On Listed Species.*

As defined by the ESA consultation regulations, cumulative effects are "effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." 50 C.F.R. § 402.02. Plaintiff suggests that the Corps and FWS should have accounted for possible loss of nesting habitats resulting from sand placement over the next 50 years, *see* Doc. 34 at 26. However, future federal actions (such as CWA permits that may be granted for future renourishment projects) are not included in the cumulative effects analysis, because they will be subjected to consultation when they occur. *See* 51 Fed. Reg. 19,926, 19,933 (June 3, 1986) (preamble to FWS consultation regulations), *cited in Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1269 (11th Cir. 2009). FWS concluded "the Service is not aware of any specific activities that would be considered cumulative effects." AR23904. Moreover, Plaintiff fails to identify any specific, reasonably foreseeable activity the Corps and FWS allegedly failed to

consider as part of the consultation process. In sum, the Corps and FWS evaluated potential

cumulative effects of the project as required under the ESA regulations. 50 C.F.R. § 402.02.

> 6.   *FWS Reasonably Concurred With the Corps' Determination That the Project Is Not Likely To Adversely Affect the West Indian Manatee.*

The FWS' "not likely to adversely affect" determination with respect to the manatee

was supported by the sponsor's commitment to implement the Standard Manatee Conditions

for In-Water Work established by the Florida Fish and Wildlife Conservation Commission,

*available at* https://myfwc.com/media/7246/manatee_stdcondin_waterwork.pdf   and   the

minimization measures outlined in the 2015 Statewide Programmatic Biological Opinion,

*available at* https://www.fws.gov/verobeach/SFESO/sBiologicalOpinion/index.cfm.

AR23924. Plaintiff suggests that FWS erred by allegedly failing to include data more recent

than 2014 *see* Doc. 34 at 27. However, Plaintiff fails to identify any particular data or study

that would have altered FWS's conclusions with respect to project effects on manatees. The

Court should defer to FWS' determinations as to what constitutes the "best available scientific

information" for purposes of rendering the biological opinion here. "The general view is that

the agency decides which data and studies are the 'best available' because that decision is itself

a scientific determination deserving deference." *Miccosukee Tribe*, 566 F.3d at 1265 (citing

*Marsh v. Or. Nat. Res. Council*, 490 U.S. at 377-78). Moreover, Plaintiff's arguments

concerning the merits of the 2016 biological opinion sound hollow because the Plaintiff does

not directly challenge any of the relevant ESA-related determinations by FWS (or NMFS) in

this suit. *See Sierra Club*, 295 F.3d at 1222 ("Neither FWS nor its administrative record is

before this Court, so it is impossible, and inappropriate, to speculate about what that agency

did or did not consider.").

32

The Corps in turn reasonably decided to rely on FWS' scientific expertise by incorporating the referenced manatee protection measures as a condition for all authorized water based activities. AR23793, 23810-11, 23853-54, 23885, 23887-88. In light of the determinations of FWS and NMFS that the Corps' activities under the Lido Key project are not likely to jeopardize (or, where applicable, adversely affect) listed species, Plaintiff must demonstrate that: 1) the FWS' and/or NMFS's conclusions themselves are arbitrary and capricious; *and* 2) the Corps unreasonably relied on these findings. *Fla. Key Deer v. Paulison*, 522 F.3d 1133, 1144-45 (11th Cir. 2008) ("[A]nother agency's reliance on that opinion will satisfy its obligations under the [ESA] if a challenging party can point to no 'new' information—i.e., information the [FWS] did not take into account—which challenges the opinion's conclusions.") (*quoting Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of the Navy,* 898 F.2d 1410, 1415 (9th Cir. 1990)).[24] Plaintiff here does not meet either criterion.

Plaintiff suggests that the Corps erroneously failed to reference Sarasota County's 2003 and 2011 Manatee Protection Plans, which purportedly identify the Project area as "high use" manatee habitat.[25] Doc. 34 at 28. However, Plaintiff fails to articulate how this document would have altered the Corps' or FWS' analysis with respect to potential effects on the manatee. It is undisputed that the manatee may be present in the project area. As this Court

---

[24] *See also Fund for Animals v. Rice*, No. 94-1913-CIV-T-23E, slip op. at 7 (M.D. Fla., Oct. 12, 1994) (as amended by deletion of n.1) (attached as Ex. C) *aff'd*, *Fund for Animals v. Rice*, 85 F.3d at 541, 548 (Corps' reliance on FWS biological opinion complied with the requirements of both the APA and Section 7(a) of the ESA and Corps may reasonably rely upon FWS's expert determinations regarding project effects on threatened and endangered species).

[25] Plaintiff also asserts that "the Corps remains inconclusive as to the type of dredge that is to be used for the duration of the Project." Doc. 34 at 29. However, the FWS biological opinion is not contingent upon project construction using any particular dredge type. Moreover, the Corps does not necessarily limit dredge type during the project planning process to encourage competitive bids. The Court should grant summary judgment in favor of the Corps as to all ESA-related claims.

held in *Fund for Animals v. Rice,* the Corps is not precluded from issuing a permit for a project simply because the project area falls within an area identified in another environmental planning document. *See* Exhibit C at 8 ("[N]either the ESA nor its implementing regulations mandate conclusions arising from the Section 7 consultation in connection with a Section 4 recovery plan."). 16 U.S.C. § 1536(a); 50 C.F.R. Part 402.

After ESA consultation is completed, an action agency may need to reinitiate consultation under certain circumstances, including if "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;" 50 C.F.R. § 402.16. Plaintiff suggests that reinitiation of consultation is warranted here based on occurrences they characterize as "two extreme weather events, mass fish and marine mammal deaths and habitat destruction." Doc. 34 at 27. The Court has already denied Plaintiff's "boundless and indefinite" request to supplement the administrative record with "any and all documents related to the ecological and economic impacts of the 2018 red-tide outbreak in Sarasota County, Florida." Doc. 31 at 8. Likewise, here, Plaintiff fails to identify any particular new information that would meet the requisite trigger for reinitiating ESA consultation pursuant to 50 C.F.R. § 402.16. The FWS biological opinion recognizes that red tide is one of the primary threats to the manatee, AR23775, and the fact that the red tide phenomena occurred during the time interval since consultation occurred does not itself constitute "new information" that would trigger reinitiation of consultation. Moreover, not "every modification of or uncertainty in a complex and lengthy project requires the action agency to stop and reinitiate consultation." *Sierra Club v. Marsh*, 816 F.2d 1376, 1388 (9th Cir. 1987) *cited in Loggerhead Turtle v. Cty. Council of Volusia Cty., Fla.*, 120 F. Supp. 2d

1005, 1026 (M.D. Fla. 2000). The Court should defer to the Corps' decision to rely on the existing expert biological opinion of FWS (which, in any event, Plaintiff does not directly challenge) to demonstrate ESA compliance. *Sierra Club*, 295 F.3d at 1222.

> **D.    Plaintiff Has Not and Cannot Plead A Marine Mammal Protection Act Claim, and In Any Case, the Corps Is Not Violating the Act.**

Finally, as to claims based on the MMPA, *see* Doc. 34 at 29, Plaintiff's omission of an MMPA claim from their Complaint precludes them from pursuing such a claim at summary judgment.[26] Even if Plaintiff had included an MMPA claim in its complaint, moreover, such a claim would fail because there is no private right of action under that statute. However, assuming Plaintiff's MMPA claim is construed to be encompassed within the existing APA claims, the Court should grant summary judgment in favor of the Corps. Potential effects of dredging on whales and other marine mammals are discussed in detail in the various iterations of the GRBO, as described above, and Plaintiff has not challenged that biological opinion. *Sierra Club*, 295 F.3d at 1222.

## V.    CONCLUSION

For the reasons stated above, the Court should grant the Corps' cross-motion for summary judgment and deny Plaintiff's motion.

Date: October 25, 2019                           Respectfully submitted,

                                                 JEAN E. WILLIAMS
                                                 Deputy Assistant Attorney General

                                                 *s/ Mark Arthur Brown*

---

[26] As the Supreme Court has made clear, "[j]urisdiction may not be sustained on a theory that the plaintiff has not advanced." *Merrell Dow Pharms. v. Thompson*, 478 U.S. 804, 809 n.6 (1986) (citing *Healy v. Sea Gull Specialty Co.*, 237 U.S. 479, 480 (1915)) ("[T]he Plaintiff is absolute master of what jurisdiction he will appeal to."), and *The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25 (1913) ("[T]he party who brings a suit is master to decide what law he will rely upon. . . .") (Holmes, J.).

MARK ARTHUR BROWN (FL Bar No. 0999504)
Wildlife and Marine Resources Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7369
mark.brown@usdoj.gov
Telephone: (202) 305-0204
Facsimile: (202) 305-0275

*s/ Jacqueline Leonard*
JACQUELINE LEONARD (NY Bar No. 5020474)
Natural Resources Section
Environment and Natural Resources Division
United States Department of Justice
jacqueline.leonard@usdoj.gov
Telephone: (202) 305-0493
Facsimile: (202) 305-0506

*s/ Leslie M. Hill*
LESLIE M. HILL (D.C. Bar No. 476008)
Environmental Defense Section
Environment and Natural Resources Division
United States Department of Justice
leslie.hill@usdoj.gov
Telephone (202) 514-0375
Facsimile (202) 514-8865

*Attorneys for Federal Defendants*

Of Counsel:
    Karolyn (Kari) Reed
    Assistant District Counsel
    U.S. Army Corps of Engineers,
    Jacksonville District

## CERTIFICATE OF SERVICE

I hereby certify that on October 25, 2019, I filed the foregoing electronically through

the Court's CM/ECF system, which caused notice to be sent to the parties.

_s/ Jacqueline M. Leonard_
Jacqueline M. Leonard