UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SOSS2, INC.,

    Plaintiff,

v.                                                                               CASE NO. 8:19-cv-462-T-23JSS

UNITED STATES ARMY CORPS OF
ENGINEERS,

    Defendant.
_____/

## ORDER

Arguing the U.S. Army Corps of Engineers violates federal environmental law and the Administrative Procedure Act by approving a "beach nourishment" project that demands the removal of sand from Big Sarasota Pass, among other sources, Save Our Siesta Sands, Inc., (SOSS2) moves (Doc. 34) for summary judgment. The Corps opposes and moves (Doc. 37) for summary judgment.

## BACKGROUND

Despite the Corps's and the City of Sarasota's prevention efforts, Lido Key's shoreline continues to erode. (AR at 12745, 23749) In 2018, the Corps and the City of Sarasota proposed a "beach nourishment" and "groins" construction project to strengthen the shoreline. (AR at 23844–45) The project entails dredging and borrowing sand from area "ebb shoals," including within Big Sarasota Pass, a

navigation channel south of Lido Key.  (AR at 23749–50, 23845)  Parts of the channel and surrounding water, including the sand "borrow areas" necessary for the project, fall within "Outstanding Florida Waters," which require "special protection" because of natural attributes.  (AR at 23948, 23972; Fla. Stat. § 403.061(28))  These natural attributes include threatened or endangered species, fragile breeding grounds, and sprawling marine ecosystems.  (AR at 23770–88)  The channel and surrounding water enable navigation and recreation and strengthen the local economy.  (AR at 23780–89)

Under the National Environmental Policy Act (NEPA), Pub. L. 91-190, the Corps analyzed the affected area and considered the environmental consequences of both the proposed project and alternative projects.  Specifically, the Corps prepared an environmental assessment to "determine whether the action to be taken constitutes a 'major federal action' — that is, an action 'significantly affecting the quality of the human environment,'" including the natural attributes.  *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008) (quoting 42 U.S.C. § 4332(C)).  The Corps's environmental assessment concluded with a "finding of no significant impact" on the human environment.  (AR at 23740)  The finding relieves the agency of the need to prepare an Environmental Impact Study (EIS), which requires a "full and fair discussion of significant environmental impacts."  *Sierra Club v. U.S. Army Corps of Engineers*, 295 F.3d 1209, 1215 (11th Cir. 2002) (citing 40 C.F.R. § 1502.1).

SOSS2 argues the Corps's environmental assessment and finding insufficiently addresses the project's full environmental effect.  According to SOSS2, by basing the

finding on allegedly inadequate and incomplete information, the Corps violates NEPA; the Clean Water Act (CWA), Pub. L. 92-500; the Endangered Species Act (ESA), Pub. L. 95-205; and the Marine Mammal Protection Act (MMPA), Pub. L. 92-522.  Ultimately, SOSS2 challenges the Corps's decision to select Big Sarasota Pass as a source for the beach nourishment project because "in failing to create an adequate [Environmental Assessment/Finding of No Significant Impact], the Corps failed to prepare an EIS analyzing the significant adverse impacts of the authorized activities."  (Doc. 34 at 21)  SOSS2 suggests a correctly prepared environmental assessment and EIS would support a different conclusion about the proper sand sources for the project.

## DISCUSSION

SOSS2 raises claims governed by the Administrative Procedure Act.[1] Under the Act, the Corps's actions must prevail unless the agency acts arbitrarily, capriciously, in abuse of discretion, or otherwise not in accord with law. 5 U.S.C. §§ 702, 706.  "This standard is exceedingly deferential." *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 541 (11th Cir.1996).  A review of the Corps's decisions

---

[1] As SOSS2 correctly anticipates (Doc. 34 at 13), standing frequently presents an issue if a party sues under environmental law. *Alabama-Tombigbee Rivers Coal. v. Norton*, 338 F.3d 1244 (11th Cir. 2003). A party pursuing judicial review under the Administrative Procedure Act must identify some "final agency action" and advance a claim that falls within the "zone of interest" protected by the statute sustaining the claim. 5 U.S.C. § 704; *Bennett v. Spear*, 520 U.S. 154, 162 (1997). The environmental assessment and finding qualify as "final action," and the Corps seemingly acquiesces to SOSS2's argument for associational standing to satisfy the "zone of interest" standard. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (endorsing environmental associational standing because enjoying the environment, even for purely aesthetic purposes, undeniably amounts to a cognizable interest for standing); *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1171 (11th Cir. 2006) (evaluating standing in the context of NEPA).

must ensure "that the agency came to a rational conclusion, 'not to conduct its own investigation and substitute its own judgment for the administrative agency's decision.'" *Sierra Club v. Van Antwerp*, 526 F.3d at 1360 (11th Cir. 2008) (citing *Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 (11th Cir.1996)).  The administrative record must evidence a rational connection between the facts and the agency's conclusions, with substantial deference to the agency's technical and scientific determinations.  *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983).  The administrative record confirms that the Corps comes to rational conclusions and complies with federal environmental law.  *Sierra Club v. U.S. Army Corps of Engineers*, 295 F.3d 1209, 1216 (11th Cir. 2002) (finding that a court has the duty "to consider not only the final documents prepared by the agency, but also the entire administrative record").

1. <u>The Corps follows NEPA with a "hard look" at the project's effect</u>

"The object of NEPA is to require federal agencies to consider environmental values [and] the initial responsibility of the federal agency is to determine the extent of the environmental impact" for a project.  *Hill v. Boy*, 144 F.3d 1446, 1449 (11th Cir. 1998).  To determine a project's environmental effect, an agency first prepares an environmental assessment providing "sufficient evidence and analysis" informing the agency if additional study of environmental consequences is necessary before beginning a project.  40 C.F.R. § 1500.3, 1508.9(a)(1); *Hill*, 144 F.3d at 1450.  Regulation informs an agency's evaluation of the significance of environmental effects, including "ecological, aesthetic, historic, cultural, economic, social, or

health, whether direct, indirect or cumulative." 40 C.F.R. §§ 1508.08, 1508.27. After evaluating these potential effects, "an agency will reach one of two conclusions in an [environmental assessment]: 'either that the project requires the preparation of an EIS to detail its environmental impact, or that project will have no significant impact [on the environment],'" a conclusion that relieves the agency of additional study. *Hill*, 144 F.3d at 1450.

An agency's decision not to prepare an EIS after finding no significant impact on the environment must meet four criteria:

> First, the agency must have accurately identified the relevant environmental concern. Second, once the agency has identified the problem it must have taken a "hard look" at the problem in preparing the [Environmental Assessment]. Third, if a finding of no significant impact is made, the agency must be able to make a convincing case for its finding. Last, if the agency does find an impact of true significance, preparation of an EIS can be avoided only if the agency finds that changes or safeguards in the project sufficiently reduce the impact to a minimum.

*Hill*, 144 F.3d at 1450. For the first criterion, the Corps describes the environment and the project's effect across environmental categories. (AR at 23770–807) (forming the "baseline conditions" to evaluate the project's effect); *St. Johns Riverkeeper, Inc. v. United States Army Corps of Engineers*, 2020 WL 2735208, at *8 –*12 (M.D. Fla. 2020) (describing the analysis of an suitable baseline as constituting the environmental concern). The parties mainly dispute whether the Corps took a "hard look" at the environmental concern. SOSS2 alleges the environmental assessment ignores "the full extent" of the project and draws conclusions based on incomplete or outdated information. (Doc. 34 at 14–21)

An agency satisfies the "hard look" standard by "examin[ing] the relevant data and articulat[ing] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citing *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  An agency fails this standard, and acts arbitrarily and capriciously, by overlooking an important aspect of a relevant problem, offering an explanation counter to the evidence, ignoring controlling regulations and authority, or reaching an "implausible" decision.  *Motor Vehicle Mfrs.*, 463 U.S. at 43.  More than 25,000 pages of the administrative record, including the roughly 900-page environmental assessment and finding, substantiate the Corps's extensive examination of the project's effect.  SOSS2's allegations to the contrary rest on speculation and conclusory, inaccurate allegations.[2]

For example, SOSS2 alleges the environmental assessment "fails to include any baseline information about how this [p]roject would impact the hydro-ecology and local economy." (Doc 34 at 15)  But the biological opinion incorporated by the environmental assessment analyzes the environmental and species baseline for the

---

[2] Perhaps the most apparent inaccuracy is SOSS2's allegation that the Corps ignores the spotted trout breeding grounds. (Doc. 34 at 21) The Corps not only acknowledges the presence of the spotted trout (AR at 23774, 24675) but proposes a mitigation strategy (AR at 23793, 23797) (pausing dredging during breeding months and by preserving seagrass), the motivation for which stems from an order issued by the Florida Department of Environmental Protection (AR at 22983–23058) after an administrative challenge. SOSS2 disagrees with the Corps's assessment of the project's effect — even after the Corps's implementing mitigation strategies for the spotted trout — but disagreement alone cannot maintain a challenge under the Administrative Procedure Act if an agency adequately considers environmental consequences. *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 97–98 (1983).

pertinent area (AR at 23888–99), including baseline human effects on the environment. (AR at 23894)  SOSS2 finds the biological opinion deficient because the Corps allegedly ignores the "adverse impacts of [pollutant] periodic discharges," among other subjects.  (Doc 34 at 15–16)  However, an agency can survive "hard look" review even if the analysis unequally addresses certain topics.  The Administrative Procedure Act substantially defers to an agency about "what evidence to find credible" and "drafting decisions like how much discussion to include on each topic, and how much data is necessary to fully address each issue."[3] *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1361 (11th Cir. 2008).  Despite this flexibility, the Corps develops an acceptable, detailed environmental baseline that addresses SOSS2's arguments.  (AR at 23770–89, 23866–82, 24228, 24316–500) (developing the environmental baseline, including the Corps's position on tidal prism, velocity, and discharge issues)

       The Corps adequately evaluates against this baseline the potential effects of the project and the alternatives.  In compliance with 40 C.F.R. § 1508.08, the Corps first describes various environmental effects, including ecological (AR at 23770–799), economic (AR at 23790–91, 23801–03, 23818, 23838–41),

---

[3] SOSS2's vague point about newly discovered seagrass and a pipeline affecting the project (Doc. 38 at 10) fails to show that the Corps arbitrarily ignored an important aspect of the project. NEPA requires that "adverse environmental effects of the proposed action are adequately identified and evaluated." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350, (1989). SOSS2 fails to show that this alleged evidence changes the adequacy of the Corps's environmental evaluation, particularly because the Corps's environmental assessment considers seagrass (AR at 23794–97, 24661) and the administrative record includes a recent pre-construction hydrographic survey that evidences the Corps awareness of potential construction issues. (AR at 6638)

navigational (AR at 23800, 23809, 23788, 7044), and cultural (AR at 23799) effects. Under 40 C.F.R. § 1508.27 the Corps acceptably considers (AR at 23806–11, 23844–82) the direct and indirect effects of the proposed activities, including a summary of cumulative effects. (AR at 23806) Although SOSS2 criticizes the cumulative analysis's terseness (Doc. 34 at 20), the entire record can establish the adequacy of an agency's consideration of a project's effects. *Sierra Club v. U.S. Army Corps of Engineers*, 464 F. Supp. 2d 1171, 1223 (M.D. Fla. 2006), *aff'd*, 508 F.3d 1332 (11th Cir. 2007). If an agency consults with other federal agencies and offers mitigation plans — as the Corps has (AR at 23479, 23797, 23883, 23945) — the obligation to extensively discuss effects lessens. *Sierra Club,* 464 F. Supp. 2d at 1223 (crediting an agency's consultations as supporting the adequacy of the analysis); *Wyoming Outdoor Council Powder River Basin Res. Council v. U.S. Army Corps of Engineers*, 351 F. Supp. 2d 1232, 1247 (D. Wyo. 2005) (stating that mitigation plans can lessen the need to evaluate environmental effects). The totality of the record, including the reports attached as appendices (AR at 23830-24676), show that the Corps in compliance with NEPA extensively considered the project's effect. In fact, the Corps analyzed beyond the regulations' requirement by conducting "scoping" outreach (AR at 12597, 23820–21, 24008–328) to solicit response on the project's effect — an unnecessary undertaking if preparing an environmental assessment. 43 C.F.R. § 46.235 ("scoping may be helpful during preparation of an environmental assessment], but is not required.").

Many of SOSS2's arguments (Doc. 34 at 16–17, 19–22) challenge the Corps's conclusion about the project's effect. But the Corps holds broad discretion to determine whether a project's effect requires an EIS. *C.A.R.E. Now, Inc. v. F.A.A.*, 844 F.2d 1569, 1573 (11th Cir. 1988). "The NEPA process involves an almost endless series of judgment calls" and "the line-drawing decisions necessitated by this fact of life are vested in the agencies, not the courts." *Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987). SOSS2 fails to provide convincing evidence that the Corps inadequately examined the effect of the project, especially considering the depth of analysis by the Corps during the years before the project. (AR at 4471, 5704, 17563, 18186)

Although finding "no significant impact" (AR at 023740) after a "hard look" at the project's effects, the Corps must satisfy *Hill's* third criterion, which requires the agency to articulate "a convincing case for its finding." *Hill*, 144 F.3d at 1450. SOSS2 believes the Corps cannot support a convincing case for the finding because the environmental assessment relies on allegedly outdated information and a narrow range of alternatives. (Doc. 34 at 17–21) The administrative record rebuts this view. The Corps certainly relied on "older" data, incorporating an extensive environmental assessment from 2002 (with a 2004 addendum) (AR at 3060–3883) and data from agency consultations, but "old does not mean that the data is unreliable," particularly if no credible reason exists to doubt the accuracy of the data over time. *Friends of Rapid River v. Probert*, 427 F. Supp. 3d 1239, 1258 (D. Idaho 2019); *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755,

763 (9th Cir. 2014) (denying a challenge featuring unchanging data). The Corps incorporated the older NEPA documents (AR at 23936–42), but specifically generated the 2018 environmental assessment to refresh the scientific basis for the project (AR at 23749, 23756), even though aspects of the project remain unaffected since earlier findings. (AR at 23756) This recent update mitigates SOSS2's criticism that the Corps relied on stale data. Also, the Corps's decision to credit older information receives substantial deference due to the agency's expertise about the information's continuing veracity. (AR at 23936–951) (describing and relying on older data); *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989) (finding that determining what constitutes the best available scientific information or data "requires a high level of technical expertise" necessitating substantial discretion); *Baltimore Gas*, 462 U.S. at 103 ("When examining this kind of scientific determination . . . a reviewing court must generally be at its most deferential.").

The same discretion applies to the project's alternatives (AR at 23759–89), which reasonably present the most feasible options for accomplishing the project under the present constraints. (AR at 23756–58, 23790) (describing the benefits of alternatives that use dredging); *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 551 (1978) ("Common sense also teaches us that the 'detailed statement of alternatives' cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man."). The Corps's analysis, which builds on a long history of evaluating alternatives (AR at 5752-5767), receives even more deference because "an agency's obligation

to consider alternatives under an [environmental assessment] is a lesser one than under an EIS." *Native Ecosystems Council v. U.S. Forest Service,* 428 F.3d 1233, 1246 (9th Cir. 2005) (citing cases adopting the more forgiving standard from the Second, Fourth, and Fifth Circuits).

Overall, the Corps accurately identifies the pertinent environmental circumstances, examines the controlling data, and articulates a satisfactory explanation. The Corps's project complies with NEPA.

2. <u>The Corps complies with the CWA by following 404(b)(1) guidelines</u>

Section 404 of the CWA regulates the discharge of dredged sediment into navigable waters. 33 U.S.C. § 1344; 40 C.F.R. § 230. The Corps may authorize the discharge of material into navigable waters if the proposed project complies with "all applicable substantive legal requirements, including . . . application of the section 404(b)(1) guidelines." 33 C.F.R. § 336.1(a). Specifically, the Corps must "determine in writing the potential short-term or long-term effects of a proposed discharge of dredged or fill material on the physical, chemical, and biological components of the aquatic environment in light of subparts C through F" of the pertinent regulations. 40 C.F.R. § 230.11 (mentioning §§ 230.20–54). SOSS2 alleges the Corps ignores the 404(b)(1) guidelines by "fail[ing] to demonstrate that the discharges of dredged material will not have unacceptable adverse effects." (Doc 34 at 22–23) (citing 40 C.F.R. §§ 230.10(c); 230.50) SOSS2 further argues the Corps fails "to include specific baseline conditions" that would allow the Corps to compare the effects of the

discharge against the default levels of turbidity and hydrocarbon pollutants in the water.  (Doc. 34 at 23)

SOSS2's arguments lack merit because the Corps complies with the 404(b)(1) requirements.  The Corps's 404(b) evaluation addresses all the factual determinations required by Section 230.11, including a discussion of turbidity, a finding about contaminants, and an analysis about the effects of discharge on the chemical and physical properties of the water column.  (AR at 23831–35)  The environmental assessment supplements the analysis.  40 C.F.R. § 230.10 (a)(4) (implying the relevance of documents produced to comply with NEPA, especially about the analysis of alternatives); *Nat'l Wildlife Fed'n v. Souza*, 2009 WL 3667070, at *17 (S.D. Fla. 2009) (utilizing the full administrative record).  The administrative record evidences scientific studies supporting a reasoned analysis of the issues. (AR at 4750, 5976, 6186, 6569, 6638, 7031, 7260, 7680, 8530, 20862 — a sampling of the engineering studies analyzed by the Corps)  And the Corps's discussion (AR at 23796, 19724) of water quality in the environmental assessment specifically addresses dredging's effect on turbidity.  Finally, the Corps commits to ensuring that "state standards for turbidity will not be exceeded." (AR at 23833)

SOSS2 claims that the Corps fails to establish a baseline of hydrocarbon pollutants (Doc. 34 at 23), but the Corps broadly addresses this issue. (AR at 23833–34; 21969, under 40 C.F.R. § 230.11(e) and (g), analyzing suspended particulates and contaminates); (AR at 21969, showing, among other topics, the Corps's awareness of scientific papers studying baseline pollution)  The Corps

- 12 -

reasonably avoids specificity about water pollutants because Section 404 focuses on the effect of discharge at the disposal site — in this case, Lido Key beach — not at the borrow areas. 40 C.F.R. § 230.10(a). The Corps's finding (AR at 23836) that the "discharge operation will not violate . . . the Clean Water Act" follows logically from the fact that the Corps places dredged sand on a beach rather than in the middle of navigable water.

Even so, the Corps's scientific conclusions and analyses about the project's compliance with the CWA deserve substantial deference. *Sierra Club v. U.S. Army Corps of Engineers*, 464 F. Supp. 2d 1171, 1182 (M.D. Fla. 2006), *aff'd*, 508 F.3d 1332 (11th Cir. 2007) ("The Court accords 'particular deference' to an agency's informed decision 'where issues of science, technical expertise or complex environmental statutes are involved.'"). SOSS2's vague assertions contain few factual details and fail to cohere in opposition to the Corps's finding. *Resolution Tr. Corp. v. Dunmar Corp.,* 43 F.3d 587, 592 (11th Cir. 1995) (holding that "mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment," and "a party may not rely on his pleadings to avoid [summary] judgment against him"). The Corps's 404(b) analysis properly describes the pertinent factual determinations and, supported by the extensive administrative record, reasonably concludes with a finding of compliance.[4]

---

[4] Because the Corps reasonably finds no adverse effect on the environment will occur because of dredging (AR at 23835–36), SOSS2's arguments about sequencing and mitigation (Doc. 38 at 16) become irrelevant. 40 C.F.R. § 230.91(c) (limiting sequencing to "unavoidable impacts").

    3.    <u>The Corps applies reasonable discretion under the ESA and the MMPA</u>

SOSS2's final claims allege violations of the ESA and the MMPA. (Doc. 34 at 23–30)  The Corps states these claims "must be dismissed for failure to provide the requisite notice of intent to sue" under the applicable authority  (Doc. 37 at 36, 45), a response that ignores SOSS2's ability to sue under the Administrative Procedure Act.  But the Corps exercises reasonable discretion under the Administrative Procedure Act's arbitrary and capricious standard.

*A. Notice*

The Corps argues that SOSS2's intent to sue letter (Doc. 37, Ex. B) insufficiently provides notice under the ESA's citizen-suit provision, 16 U.S.C. § 1540(g)(1)(A), because the letter "was addressed to the Corps, not the Secretar[y] of the U.S. Department of the Interior or Commerce, as required pursuant to 16 U.S.C. § 1540(g)(2)(A)(i)." (Doc 37 at 38)  Also, the Corps asserts the letter "does not allege violations with respect to any ESA-related determinations," about species other than the manatee.  (Doc 37 at 38)

The ESA enables a citizen to "commence a civil suit … to enjoin any person, including the United States and any other governmental instrumentality or agency . . . who is alleged to be in violation of any provision" of the regulation. 16 U.S.C. § 1540(g)(1)(A).  This citizen-suit provision requires a party to provide "written notice of the violation" to the pertinent Secretary and "to any alleged violator of any such provision or regulation."  16 U.S.C. § 1540(g)(2)(A)(i); *Nat'l Envtl. Found. v. ABC Rail Corp.*, 926 F.2d 1096, 1099 (11th Cir. 1991) (explaining

- 14 -

that the purpose of the notice requirement "is to give the alleged violator an opportunity to bring itself into compliance with the Act, and thus make the citizen suit unnecessary"). If a claim alleges the Secretary failed "to perform any act . . . which is not discretionary," a party must plead the claim under the ESA and comply with the notice restrictions. 16 U.S.C. § 1540(g)(1)(C); *Sierra Club v. Salazar*, 961 F. Supp. 2d 1172 (W.D. Wash 2013) (explaining the requirement).

Conversely, if a party challenges a discretionary final agency action under the ESA, including the scientific basis for a biological opinion, the claim falls under Section 706, Administrative Procedure Act, which lacks a notice requirement. *Bennett v. Spear*, 520 U.S. 154, 175 (1997); *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 307 F.3d 964, 975 (9th Cir. 2002) (describing the difference between an ESA citizen-suit and an Administrative Procedure Act action).

Although suffering from vagueness and generality, SOSS2's papers disclose an intent to challenge the Corps's compliance with the ESA under the Administrative Procedure Act's arbitrary and capricious standard for reviewing discretionary decisions. For example, SOSS2's intent to sue letter specifically describes the claims within the Administrative Procedure Act. (Doc. 34, Ex. B at 1) ("You are hereby notified of our intent to bring a civil action . . . pursuant to the APA, 5 U.S.C. § 706, in order to correct the Corps's violations of [ ] NEPA, CWA, and ESA"). The complaint alleges the Corps violates the Administrative Procedure Act by ignoring the ESA's standards. (Doc. 1 at 1, 6)  The bulk of SOSS2's

- 15 -

argument for and against summary judgment targets the Corps's exercise of the discretion granted under Section 7 of the ESA.  (Doc. 34 at 23–29; Doc. 38 at 18)  The Corps's exercising the discretion — whether right or wrong — to rely on a biological opinion is a decision SOSS2 can challenge under the Administrative Procedure Act but not, absent sufficient notice, under the ESA.  *Bennett*, 520 U.S. at 175 (describing the claims under the Administrative Procedures Act).  Consequently, SOSS2 properly claims under the Administrative Procedure Act and avoids the notice requirement.[5]

*B. ESA and MMPA*

Despite properly pleaded claims, SOSS2 fails to show the Corps acted arbitrarily or capriciously under the ESA.  SOSS2 begins with allegations about the consequences of the project to endangered species and their food sources.  (Doc 34 at 24–25)  But SOSS2 ignores the fact that the Corps, in consultation with other agencies, considered these consequences.  The Corps consulted with the National Marine Fisheries Service (NMFS) and the Fish and Wildlife Service (FWS), both of which produced reasoned biological opinions as recently as 2016.  (AR at 23883, 23945)  These opinions include findings about the project's effect on species.  (AR at 23886-88)  Also, the opinions describe minimization efforts complying with other biological studies.  (AR at 23885, 23945) (mentioning, among

---

[5] Despite the Corps's argument otherwise (Doc. 37 at 35, 45), by claiming under the Administrative Procedure Act SOSS2 avoids the requirement to include the MMPA claim in the complaint. (Doc. 37 at 45)

- 16 -

others, the 2013 Piping Plover Biological Study and the Gulf of Mexico Biological Opinion) SOSS2 might disagree with the findings in these studies, but disagreement alone cannot justify inadequacy. *Fla. Keys Citizens Coal., Inc. v. Army Corps of Eng'rs*, 374 F. Supp. 2d 1116, 1162 (S.D. Fla. 2005) (finding that although "[p]laintiffs and possibly others may disagree . . . such disagreement is insufficient for the Court to declare that the . . . biological opinions . . . are arbitrary and capricious"). SOSS2 must show the Corps's reliance on these findings amounts to arbitrary and capricious exercise of discretion.

SOSS2 implies the Corps arbitrarily analyzed a portion of the designated critical habitat for the species protected by the ESA. (Doc. 34 at 25–26) But again the record contradicts SOSS2. The FWS biological opinion explicitly defines the action area of the study to "encompass all areas to be affected directly or indirectly by the action and not merely the immediate area involved." (AR at 23886) The administrative record evidences this broad approach. The NMFS biological opinion evaluates the effect of the project in light of recent developments about the loggerhead turtle and in light of several other past opinions that address expansive study areas. (AR at 23945–51, 18331) The Corps even relies on and incorporates minimization measures based on broad biological studies. (AR at 20381, 22128, 23794, 23812, 23853–55, 23859–62, 23883–935)

These biological opinions and mitigation measures, supplemented by the full administrative record, support the adequacy of the Corps's analysis of affected species protected under the ESA. Further, the Corps reasonably relies on expert

- 17 -

reports. These reports analyzed the project's effect on seagrass (AR at 23843–935) and on pertinent species (AR at 23904), including the manatee (AR at 23793, 23810–11, 23853–54, 23885–88), the spotted seatrout (AR at 23774, 24675), and others. (AR at 23793–95, 23886–88) The Corps's decisions to rely on the expert reports receive substantial deference because the decisions result from an exercise of the agency's technical expertise and judgment about the applicable science and the available and feasible means for compliance with the ESA. *Sierra Club v. U.S. Army Corps of Engineers*, 295 F.3d 1209, 1222 (11th Cir. 2002) (holding that a plaintiff bears a heavy burden to show that reliance on outside agency consultations violates the Administrative Procedure Act because this reliance falls "firmly within that agency's area of expertise"); *Nat. Res. Def. Council v. Nat'l Park Serv.,* 250 F. Supp. 3d 1260, 1306 (M.D. Fla 2017) ("An agency's expert determinations such as the appropriate mitigation measures to protect endangered species are owed exceeding deference."). None of SOSS2's arguments offer a convincing reason to dismiss the expertise of the Corps, particularly because SOSS2 repeats unfounded arguments about stale data (Doc. 34 at 27) and incomplete analysis (Doc. 34 at 27–29), both of which arguments fail for the same reasons described earlier under NEPA. *Misccosukee Tribe of Indians v. United States*, 566 F.3d 1257, 1265 (11th Cir. 2009) ("The general view is that the agency decides which data and studies are the 'best available' because that decision is itself a scientific determination.").

SOSS2's claim about the MMPA suffers the same weaknesses. SOSS2 alleges that the environmental assessment arbitrarily addresses the project's effect on marine

mammals under the MMPA's prescriptions (Doc. 34 at 29; Doc. 38 at 24) but offers no explicit evidence explaining the insufficiency of the biological opinions on which the Corps relies in considering the effects of dredging on whales or other marine mammals. (AR at 23945–46, which is an NMFS biological opinion describing the iterations of the Gulf of Mexico Regional Biological Opinions and stating the earlier opinions "remain in effect as supplemented" until "trigger for re-initiation has occurred") Absent compelling evidence to the contrary, the veracity of these opinions falls distinctly within the expertise of the preparing agency. *Fla. Key Deer v. Paulison,* 522 F.3d 1133, 1144–45 (11th Cir. 2008) ("Another agency's reliance on that opinion will satisfy its obligations . . . if a challenging party can point to no 'new' information, i.e., information the [agency] did not take into account — which challenges the opinion's conclusions.").[6]

## CONCLUSION

A review of the administrative record confirms that the Corps arrived at rational conclusions compelled by a thorough review of the project's effect on the affected environment. For this reason and for those argued ably by the Corps, SOSS2's motion (Doc. 34) for summary judgment is **DENIED**. The Corps's

---

[6] SOSS2 often points to the occurrence of "red tide" as compelling evidence reducing the accuracy of the biological opinions. (Doc. 34 at 27; Doc. 23 at 3) But these opinions acknowledge the threat of "red tide." (AR at 23775) (discussing an earlier FWS opinion on the subject) The decision not to discuss the threat in detail or to give weight to the issue falls within the informed judgment of the reviewing agency. Additionally, SOSS2 failed to show the causal relation between the project and the frequency or severity of red tide. (Doc. 31 at 8)

cross-motion (Doc. 37) is **GRANTED**.  The clerk must enter judgment in favor of the Corps and against SOSS2, terminate the pending motions, and close the case.

ORDERED in Tampa, Florida, on September 30, 2020.

*[signature]*

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE
